No. 08-17742

# In the United States Court of Appeals
# for the Ninth Circuit
_____

G. CLINTON MERRICK, JR.,

*Plaintiff/Appellee*,

v.

PAUL REVERE LIFE INSURANCE COMPANY, a Massachusetts corporation;
UNUMPROVIDENT CORPORATION (d/b/a UNUM LIFE INSURANCE
COMPANY OF AMERICA and PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY); and DOES I through X inclusive, and ROES I
through X, inclusive,

*Defendants/Appellants*,

_____

## On Appeal from the United States District Court
## for the District of Nevada
## Cause No. 2:00-cv-00731-JCM-RJJ

## APPELLEE'S ANSWERING BRIEF

Thomas L. Hudson
Sharad H. Desai
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2100
Phoenix, Arizona  85012-2794
(602) 640-9301

Richard H. Friedman
FRIEDMAN RUBIN & WHITE
1126 Highland Avenue
Bremerton, Washington  98337

Julie A. Mersch
LAW OFFICE OF JULIE MERSCH
701 South 7th Street
Las Vegas, Nevada  89101

*Counsel for Plaintiff/Appellee*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. vii

JURISDICTION ................................................................................................. 1

FACTS ............................................................................................................... 1

I. The Facts Should Be Viewed in Plaintiff's Favor, Judge Mahan's Findings Are Entitled to Deference, and Many Critical Facts Have Already Been Resolved.................................................................... 1

II. Merrick Had a Highly-Successful Career as a Venture Capitalist....... 3

III. In 1995, Merrick Became Disabled from His Occupation and Filed a Disability Claim................................................................................. 3

IV. After Merrick Submitted His Claim, Provident Adopted a Barrage of Carefully-Honed Strategies Designed to Deny Expensive Claims Like Merrick's Regardless of Merit ....................................... 4

V. The Combined Effect of Defendants' Aggressive Claim-Closing Strategies Impacted Merrick's Claim................................................. 7

VI. Defendants Continued Their Improper Conduct Notwithstanding Regulatory Action.............................................................................10

VII. Merrick's Nine Years' of Litigation with Defendants .......................12

    A. The 2004 Trial ......................................................................12

    B. The Appeal ...........................................................................13

    C. The 2008 Trial ......................................................................14

        1. Judge Mahan's Ruling Concerning the Scope of Trial and the Use of Evidence Like the Claim File........14

        2. The Parties' Theories and Evidence ..............................15

        3. Defendants' Post-Trial Motion......................................16

i

ARGUMENT SUMMARY ................................................................17

ARGUMENT........................................................................21

I.    The District Court Correctly Limited the Retrial to the Amount of Defendants' Punitive Liability .........................................21

    A.    Standard of Review................................................21

    B.    This Court's Mandate and Issue Preclusion Required Judge Mahan to Limit the Retrial to the Amount of Defendants' Punitive Liability .................................21

        1.    Whether Judge Mahan Correctly Limited the New Trial's Scope Depends on the Issues Resolved in the First Appeal .........................................21

        2.    The First Appeal Expressly Rejected Defendants' Request for a New Trial on Punitive Liability and Damages .....................................................22

        3.    Judge Mahan Appropriately Gave Preclusive Effect to this Court's Finding Concerning Punitive Liability .....................................................24

        4.    The Opinion's Limited Remand Is Consistent with *White v. Ford* ..............................................25

    C.    Defendants' Arguments Concerning the Remand Largely Miss the Point .......................................................25

        1.    No Inference Can Be Drawn from the Denial of the Motion for Clarification .........................................25

        2.    N.R.S. § 42.005 Is Irrelevant.........................................26

        3.    Federal Law Does Not Require a New Trial on Punitive Damages and Liability ...................................27

    D.    Requiring Defendants to Live with Their Own Request Is Not "Profoundly Unfair".......................................29

II.  Judge Mahan Acted Well Within His Discretion by Precluding Irrelevant, Duplicative, and Improperly Prejudicial Evidence ..........30

    A.  Standard of Review.................................................................30

    B.  Young Mee Merrick:  Judge Mahan Properly Rejected Defendants' Collateral Attack on the Prior Judgment .............31

        1.  Pertinent Background....................................................31

        2.  The Trial Court Had the Discretion to Deny Defendants' Discovery Requests and Exclude "Evidence" Concerning the Offer to Testify for $5 Million ..........................................................................32

    C.  Judge Mahan Properly Controlled the Presentation of Evidence in the Face of Defendants' Repeated Attempts to Misuse Evidence ...................................................................34

        1.  Judge Mahan Properly Limited Defendants' Attempt to Relitigate Merrick's Disability ...................35

        2.  Judge Mahan Had the Discretion to Exclude the Irrelevant and Confusing Evidence Concerning Merrick's Other Disability Insurer (Northwestern) .......36

        3.  Judge Mahan Properly Excluded Evidence Gathered After the Litigation Ensued That Did Not Impact Defendants' Conduct in Denying the Claim ......38

        4.  This Court Already Determined Judge Mahan Had the Discretion to Enforce a Sanction Order Predicated on Defendants' Manipulation of the Claim File ....................................................................39

        5.  Judge Mahan Properly Precluded Defendants' Additional Improper and Duplicative Questioning of Yet Another Witness Concerning the Claim File ......40

    D.  Judge Mahan Had the Discretion to Admit Evidence Concerning Defendants' Overall Scheme to Deny Policies Like Merrick's ........................................................................40

III.  Defendants' Complaints About a "Series of Errors" Distorts the Record and Applicable Standard of Review ....................................41

    A.  Judge Mahan Had the Discretion to Overrule Defendants' Unexplained "Objection" to a Question Concerning a Topic They Raised, and to Deny Their Request for a Mistrial/Curative Instruction ...................................41

        1.  Additional Background .................................41

        2.  Standard of Review.....................................43

        3.  Argument....................................................44

    B.  Judge Mahan Had the Discretion to Allow Plaintiff's Counsel to Request a Specific Amount of Punitive Damages in His Closing Argument .........................46

    C.  Judge Mahan's Proportionality Instruction Complied with Nevada Law and Ninth Circuit Precedent ..............48

IV.  Defendants Improperly Label as "Judicial Misconduct" Judge Mahan's Appropriate Efforts to Confine Counsel to Ninth Circuit and District Court Rulings ...............................................50

    A.  Standard of Review...............................................50

    B.  Judicial Misconduct in the Civil Context Warrants Reversal Only in Truly Egregious Cases................................51

    C.  Defendants' Attack on Judge Mahan Ignores Their Own Repeated Efforts to Skirt His Rulings ....................................53

        1.  Judge Mahan Cut Off Defendants' Opening Only After They Repeatedly Violated an In Limine Ruling .........................................................54

        2.  Judge Mahan Limited Further Questioning of DiLisio Concerning the Claim File Only After Defendants Again Violated Court Orders......................56

        3.  Defendants' Other Allegations of "Misconduct" Likewise Rest on Distorting the Record........................60

V.   The Punitive Award, as Reduced by Judge Mahan, Comports with
     Due Process ........................................................................63

     A.   Standard of Review.................................................63

     B.   The Ninth Circuit's "Rough Framework" Is Controlling in
          This Case ..............................................................65

     C.   Judge Mahan Correctly Applied the Ninth Circuit's Rough
          Framework..............................................................67

          1.   Judge Mahan Correctly Found the Defendants'
               Conduct Highly Reprehensible ....................................67

               a)   Judge Mahan's Findings .....................................68

               b)   Defendants Failed to Show That Judge Mahan's
                    Findings Concerning the Reprehensibility
                    Factors Were Clearly Erroneous ..........................69

               c)   Defendants' "Other Factors" and "Remedial
                    Measures" Miss the Point ...................................74

          2.   Judge Mahan Correctly Determined That This
               Case Falls Within the Second Category of the
               Rough Framework, Making a High Single-Digit
               Ratio Appropriate ........................................................75

               a)   The Court Should Reject Defendants' Request
                    to Ignore the Controlling Rough Framework .......75

               b)   Judge Mahan Correctly Calculated the Ratios .....77

               c)   Defendants' Remaining Ratio Arguments Lack
                    Merit...................................................................79

          3.   Comparable Civil and Criminal Penalties Support
               the Award .................................................................80

     D.   Other Considerations Show That Defendants Have No
          "Due Process" Right to Any Further Reduction .....................80

1.  The Punitive Awards Are Necessary to Further Nevada's Interests in Punishing Systematic Insurance Bad Faith ......................................................81

2.  Defendants Had Ample Notice of Their Punishment .................................................................84

CONCLUSION ..................................................................................85

CERTIFICATION OF COMPLIANCE WITH RULE 32(a)...............................87

CERTIFICATE OF SERVICE............................................................88

# TABLE OF AUTHORITIES

**Page**

## Cases

*Aetna Life Ins. Co. v. Lavoie*, 505 So. 2d 1050 (Ala. 1987)...................................34

*Ainsworth v. Combined Ins. Co.*, 763 P.2d 673 (Nev. 1988) ...........................83, 85

*BMW of N. Am. v. Gore*, 517 U.S. 559 (1996)..................................................passim

*Bocci v. Key Pharms., Inc.*, 76 P.3d 669 (Or. Ct. App. 2003)...............................76

*Boeken v. Philip Morris, Inc.*, 26 Cal. Rptr. 3d 638, 127 Cal. App. 4th 1640
     (Cal. Ct. App. 2005)...................................................................................45

*Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105 (Okla. 1991) ....................................33

*Campbell v. State Farm*, 98 P.3d 409 (Utah 2004)....................................70, 76, 79

*Casillas-Diaz v. Palau*, 463 F.3d 77 (1st Cir. 2006).............................................76

*Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*,
     532 U.S. 424 (2001)............................................................................passim

*Coralluzzo v. Educ. Mgmt. Corp.*, 86 F.3d 185 (11th Cir. 1996) ..........................47

*Daka, Inc. v. McCrae*, 839 A.2d 682 (D.C. Cir. 2003) .........................................64

*Davis v. Ford Motor Co.*, 128 F.3d 631 (8th Cir. 1997) .......................................47

*Defender Indus., Inc. v. Northwestern Mut. Life Ins. Co.*, 938 F.2d 502
     (4th Cir. 1991) ..........................................................................................28

*Delgado v. Holder*, 563 F.3d 863 (9th Cir. 2009).................................................67

*DeRance, Inc. v. PaineWebber Inc.*, 872 F.2d 1312 (7th Cir. 1989) .....................28

*Diesel Mach., Inc. v. B.R. Lee Indus.*, 418 F.3d 820 (8th Cir. 2005).....................47

*Eden Elec., Ltd. v. Amana Co.*, 370 F.3d 824 (8th Cir. 2004)................................76

*FDIC v. Hamilton*, 122 F.3d 854 (10th Cir. 1997) ...............................................64

*Freund v. Nycomed Amersham*, 347 F.3d 752 (9th Cir. 2003)...............................26

vii

*Gagnon v. Continental Cas. Co.*, 260 Cal. Rptr. 305, 211 Cal. App. 3d 1598
(Cal. Ct. App. 1989)..................................................................................45

*Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931)...............27

*Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415 (1996) .................................26

*Haberman v. The Hartford Ins. Group*, 443 F.3d 1257 (10th Cir. 2006) ..............76

*Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282 (9th Cir. 1984)..........................51

*Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998
(9th Cir. 2004) ...............................................................................passim

*Hansen v. Comm'r of Internal Revenue Serv.*, 820 F.2d 1464
(9th Cir. 1987) ..............................................................................51, 52, 62

*Hayes v. Woodford*, 301 F.3d 1054 (9th Cir. 2002)..............................................69

*Holcombe v. Hosmer*, 477 F.3d 1094 (9th Cir. 2007)...........................................22

*Hollock v. Erie Ins. Exchange*, 842 A.2d 409 (Pa. Super. Ct. 2004)....................76

*In re Exxon Valdez*, 490 F.3d 1066 (9th Cir. 2006) ...........................66, 67, 69, 80

*In re Yagman*, 796 F.2d 1165 (9th Cir. 1986).......................................................52

*Kennedy v. Los Angeles Police Department*, 901 F.2d 702 (9th Cir. 1990) .....52, 54

*LaForge v. State of Nevada*, 997 P.2d 130 (Nev. 2000) ..................................22, 24

*Lassiter v. City of Bremerton*, 556 F.3d 1049 (9th Cir. 2009)................................ 1

*Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146
(9th Cir. 2002) ...........................................................................................64

*Levinson v. Prentice-Hall, Inc.*, 868 F.2d 558 (3d Cir. 1989) ...............................28

*Maheu v. Hughes Tool Co.*, 569 F.2d 459 (9th Cir. 1977)...............................53, 63

*Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003) .............80, 82

*Maxey v. Freightliner Corp.*, 727 F.2d 350 (5th Cir. 1984)............................27, 28

*McClain v. Metabolife Int'l*, 259 F. Supp. 2d 1225 (N.D. Ala. 2003)...................76

viii

*McEuin v. Crown Equip. Corp.*, 328 F.3d 1032 (9th Cir. 2003) ............................30

*Mercado v. Los Angeles Unified Sch. Dist.*, 51 F.3d 281 (9th Cir. 1995)..............50

*Merrick v. Paul Revere Life Insurance Co.*, 500 F.3d 1007 (9th Cir. 2007)....passim

*Monessen SW Ry. Co. v. Morgan*, 486 U.S. 330 (1988) .......................................79

*Morgan v. Woessner*, 997 F.2d 1244 (9th Cir. 1993)......................................44, 47

*Munoz v. County of Imperial*, 667 F.2d 811 (9th Cir. 1982) .................................26

*O'Neill v. Comm'r of Internal Revenue Serv.*, 271 F.2d 44
    (9th Cir. 1959) .............................................................................................78

*Oregon v. Guzek,* 546 U.S. 517 (2006) ................................................................29

*Pac. Mut. Life v. Haslip*, 499 U.S. 1 (1991) ........................................................82

*Pau v. Yosemite Park & Curry Co.*, 928 F.2d 880 (9th Cir. 1991)........................51

*Penk v. Oregon State Bd. of Higher Educ.,* 816 F.2d 458 (9th Cir. 1987)..............46

*Philip Morris USA Inc. v. Williams*, 129 S. Ct. 1436 (2009) ................................77

*Philip Morris USA v. Williams*, 549 U.S. 346 (2007)...........................................40

*Planned Parenthood v. Am. Coalition of Life Activists,* 422 F.3d 949
    (9th Cir. 2005) ...............................................................................66, 77, 78

*Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 345 F.3d 1366 (Fed.
    Cir. 2003)......................................................................................................76

*Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372 (Fed. Cir. 2008) .................21

*Romero v. City of Pomona*, 883 F.2d 1418 (9th Cir. 1989) ..................................39

*S. Union Co. v. Irvin*, 563 F.3d 788 (9th Cir. 2008) .......................................67, 83

*Segal v. Am. Tel. & Tel. Co.,* 606 F.2d 842 (9th Cir. 1979) ..................................22

*Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001)........................22

*Shad v. Dean Witter Reynolds, Inc.,* 799 F.2d 525 (9th Cir. 1986) .................43, 51

*Silver v. Executive Car Leasing Long-Term Disability Plan*, 466 F.3d 727 (9th Cir. 2006) ......................................................................... 2

*Spaeth v. Union Oil Co. of Cal.*, 710 F.2d 1455 (10th Cir. 1983) .........................28

*State Farm Fire & Cas. Co. v. Balmer*, 891 F.2d 874 (11th Cir. 1990) ................34

*Stenson v. Lambert*, 504 F.3d 873 (9th Cir. 2007).......................................15, 29

*Stevens v. Owens-Corning Fiberglass Corp.*, 57 Cal. Rptr. 2d 525, 49 Cal. App. 4th 1645 (Cal. Ct. App. 1996) ...........................................................45

*Stogsdill v. Healthmark Partners, L.L.C.*, 377 F.3d 827 (8th Cir. 2004)...............64

*Tahoe-Sierra Pres. Counsel v. Tahoe Regional Planning Agency*, 322 F.3d 1064 (9th Cir. 2003).......................................................................22

*Trinity Evangelical Lutheran Church & School-Freistadt v. Tower Ins. Co.*, 661 N.W.2d 789 (Wis. 2003) ........................................................................76

*Tritchler v. County of Lake*, 358 F.3d 1150 (9th Cir. 2004)......................30, 43, 49

*TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993) .............74, 80

*United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181 (9th Cir. 2001) ...........................................................................21

*United States v. Bryant*, 461 F.2d 912 (6th Cir. 1972).......................................62

*United States v. Cardenas-Mendoza*, 579 F.3d 1024 (9th Cir. 2009)....................46

*United States v. Comprehensive Drug Testing*, 579 F.3d 989 (9th Cir. 2009) .......24

*United States v. Dufur*, 648 F.2d 512 (9th Cir. 1980) .............................................44

*United States v. Gallenardo*, 579 F.3d 1076 (9th Cir. 2009) ................................48

*United States v. Gomez-Norena*, 908 F.2d 497 (9th Cir. 1990)............................44

*United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000) ...........................21, 22

*United States v. Laurins*, 857 F.2d 529 (9th Cir. 1988) ...........................54, 56, 59

*United States v. Segal*, 852 F.2d 1152 (9th Cir. 1988)..........................................44

x

*United States v. Springer*, 51 F.3d 861 (9th Cir. 1995) ............................................ 50

*Walker v. Sumner*, 14 F.3d 1415 (9th Cir. 1994) ..................................................... 53

*Ward v. Westland Plastics, Inc.*, 651 F.2d 1266 (9th Cir. 1980) ...................... 52, 53

*White v. Ford Motor Co.*, 500 F.3d 963 (9th Cir. 2007) ................................. passim

*Williams v. Philip Morris*, 176 P.3d 1255 (Or. 2008) ............................................. 75

*Zilisch v. State Farm Mut. Auto. Ins.*, 995 P.2d 276, 280 (Ariz. 2000) ................. 34

**Statutes**

N.R.S. § 42.005 ............................................................................................. 26, 82

N.R.S. § 686A .......................................................................................................... 80

**Other Authorities**

18 James Wm. Moore et al., Moore's Federal Practice (3d ed. 1999) .............. 21, 33

2-8 Eric Mills Holmes, *Holmes' Appleman on Insurance* 2d (2d ed. 1996) .......... 70

Mollie Marti & Roselle Wissler, *Be Careful What You Ask For: The Effect
of Anchors on Personal Injury Damages Awards*, 6 J. Exp. Psych. 91
(June 2001) ................................................................................................. 48

Reid Hastie, et al., *Juror Judgments in Civil Cases: Effects of Plaintiff's
Requests and Plaintiff's Identity on Punitive Damages Awards*, 23
Law & Hum. Behav. 445 (Aug. 1999) ........................................................ 47

Webster's New Universal Unabridged Dictionary (2d ed. 2003) .......................... 23

# JURISDICTION

Merrick agrees with the jurisdictional statement of Paul Revere Life

Insurance Company ("**Revere**") and UnumProvident Corporation ("**Provident**")

collectively the ("**Insurers**" or "**Defendants**").

# FACTS[1]

## I.    The Facts Should Be Viewed in Plaintiff's Favor, Judge Mahan's Findings Are Entitled to Deference, and Many Critical Facts Have Already Been Resolved

The facts are set forth in *Merrick v. Paul Revere Life Insurance Co.*, 500

F.3d 1007 (9th Cir. 2007) and the Findings of Fact and Conclusions of Law re:

Defendants' Motion for New Trial, Remittitur or Reduction of Punitive Damages

(the "**Order**") issued by the district court (Mahan, J.).[2]  As this appeal involves a

jury verdict, this Court views all evidence "in the light most favorable to the

verdict."  *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1053 (9th Cir. 2009)

(citation omitted).

Additionally, Judge Mahan's findings are entitled to deference.  As a

threshold matter, the record reflects that in issuing his Order, Judge Mahan

carefully reviewed the proposed findings, and made a number of changes, deleted

---

[1] This brief uses the following abbreviations for record citations:  Docket items ("**D**"), trial exhibits ("**EX**"), Opening Brief ("**OB**"), Amicus Brief ("**AB**"), Appellants' Excerpts of Record ("**ER**"), and Supplemental Excerpts of Record ("**SER**").  Transcripts are cited by date.  Most cited record materials are included in the SER.

[2] ER1-26.

entire paragraphs, modified sentences, and otherwise put his "touch" on the Order.[3]
Although he adopted most of the proposed findings, he did not "uncritically
adopt[]" them. *Silver v. Executive Car Leasing Long-Term Disability Plan*, 466
F.3d 727, 733 (9th Cir. 2006). Moreover, "[e]ven when a district court adopts
wholesale the findings of fact proposed by one party," the "clearly erroneous"
standard still applies, just "with a careful inspection of the record," *id.* –
something Merrick welcomes.

Lastly, in this case, as explained further in Argument § I(B)(1), issues
affirmed in the first appeal must be given preclusive effect, including that:

- Merrick was disabled;

- Defendants "acted unreasonably in handling . . . Merrick's claim;"

- Defendants "knew or recklessly disregarded that [they] acted without
  a reasonable basis;"

- Defendants each "act[ed] with oppression, fraud, or malice, express or
  implied, in its dealings with plaintiff . . . ."[4]

Throughout their brief, the Insurers turn these fundamental standards upside
down, and pretend that the previous trial and appeal never occurred. This section
summarizes the facts pursuant to the correct standard.

---

[3] SER Tab A.
[4] D287(#11, 15, 20); D280.

## II.  Merrick Had a Highly-Successful Career as a Venture Capitalist

After graduating from Stanford with an MBA in 1966, Merrick – the man Defendants called a "malingerer" – became the marketing manager for General Foods, developed concepts like the "Kool-Aid Man,"[5] and later led the largest pasta maker in the United States.[6]  He then became a successful venture capitalist,[7] helping to start companies like the Samuel Adams Beer company.[8]

## III.  In 1995, Merrick Became Disabled from His Occupation and Filed a Disability Claim

In the early 1990s, Merrick's dream life began to unravel as he started suffering from inexplicable fatigue, muscle pain, aches, spasms, and mental confusion.[9]  Driven to "figure out what was wrong with [him]," Merrick saw numerous specialists.[10]  But Merrick could not regain his ability to function, particularly under stress.[11]  Fortunately, years earlier, Merrick had purchased an "own-occupation" policy with Revere to protect his family from such an

---

[5] 6/18/08:115:14-121:4.
[6] 6/18/08:122:1-19.
[7] EX174:44.
[8] 6/18/08:122:20-125:12.
[9] 6/18/08:131:16-132:20; EX174:42.
[10] 6/18/08:132:21-133:18.
[11] 6/18/08:132:17-20, 134:13-135:9.

unexpected illness.[12]  Accordingly, Merrick reluctantly submitted a claim to Revere in 1995.[13]

Although over time his doctors, Defendants' in-house doctors, and the independent medical examiners could not agree concerning the underlying nature of Merrick's health problems, there was broad consensus that he suffered a "significant impairment" that left him unable to work at his job.[14]  Revere accordingly began paying Merrick $12,000/month in benefits.

## IV. After Merrick Submitted His Claim, Provident Adopted a Barrage of Carefully-Honed Strategies Designed to Deny Expensive Claims Like Merrick's Regardless of Merit

Shortly before Merrick submitted his claim, several key players in the disability insurance business, including Revere and Provident, began realizing that they had made mistakes in connection with the "own occupation" disability income policies.  In the 1980s, they had aggressively marketed these policies to high-income professionals – *i.e.*, doctors, lawyers, and executives.  As the competition intensified, companies "liberalized" the "[p]roduct provisions and underwriting," with Provident taking "it a few steps further" than the competition to win the "market share battle."[15]

---

[12] 6/18/08:126:12-25, 155:22-156:5.
[13] 6/1/08:135:21-24, 136:22-23; EX174:35-36.
[14] *E.g.,* EX174:174, 160, 202, 203.
[15] EX22:1-2; EX325:2-3; EX326:2-3.

In the 1990s, companies began "losing hundreds of millions of dollars" because the policies had been "poorly underwritten and underpriced."[16] Of course, these mistakes should not have affected claims handling. To the contrary, it is well understood by insurers that profitability must be addressed *before* a policy is sold by the actuarial, marketing, and underwriting departments that design and sell the policy, *not* by claims handlers afterwards.[17]

Facing pressure to stop the financial bleeding, Provident nevertheless did the unthinkable and turned to its claims department to insulate its bottom line from these policies. Disregarding their fiduciary-like obligations, Provident implemented arbitrary and ambitious claim-closing goals called "net termination ratios" (*i.e.*, terminated claims minus reopened claims, divided by new claims), and set financial goals for claim closures based on reserves.[18]

The company then deployed a number of claim-scrubbing "initiatives" and took other steps to push "deep into [the company's] culture" the strategies necessary to meet the claim termination goals.[19] For example, Provident required adjusters to develop and maintain a "Top 10 List" – "a list of ten claimants where intensive effort will lead to successful resolution" (*i.e.*, termination) "of the claim."

---

[16] EX22:2; 6/17/08:43:9-19.

[17] EX218; 6/17/08:20:3-21:6; 6/16/08:175:20-180:25.

[18] 6/17/08:66:24-69:24; EX49:1; EX59:1; EX95:1; EX104:1; EX108:1; EX117:1; EX135:1; EX327:3.

[19] 6/17/08:74:12-90:8; EX61:1; EX95:2; EX326:8-12.

It later placed stock quotes on all "Customer Care Center" floors to "raise awareness of corporate performance" and the claim department's "contributions to the corporation's performance."[20]

Initiatives to help "Institutionaliz[e] the Scrub"[21] included,

- **"objectification"** – insisting on so-called "objective evidence" (*i.e.*, demonstrative tests) to prove illnesses that cannot be documented by objective evidence;

- **occupation reclassification** – reclassifying an insured's occupation as a pretext to denying coverage (*e.g.*, claiming that a person who could not work due to a disability was "unemployed" and could not receive benefits if they could perform the duties of an "unemployed" person);

- **fraudulent claims settling** – seeking to pressure insureds into low-ball settlements by misrepresenting policy terms and/or the evidence supporting the claim;

- **medical record distortion** – selectively using medical information as a pretext for denying a claim supported by other medical evidence; and

- **shifting the burden** – telling the insured that he or she had to prove their disability in accordance with standards not applicable under the particular policy.[22]

*See also Merrick*, 500 F.3d at 1012.

To maximize the leverage from these claim-scrubbing techniques, in April 1995, Provident began holding "round table" meetings – closed-door sessions at

---

[20] EX232:2.
[21] EX61:1.
[22] EX61:3, ER23; EX327:2-5; 6/17/08:118:9-122:14.

which experts collaborated to "triage" the most expensive claims.[23]  Provident

considered calling these meetings "Legal" to protect their secrecy, but decided

instead to simply destroy the file review sheets.[24]

These meetings proved "quite worthwhile," meaning that during the first

month of roundtables, 11 claims worth $7.3 million were "resolved," with other

claims targeted for "additional fact finding" to find "expeditiously" some basis for

eliminating them.[25]  Within fifteen months, 585 claims representing $323 million

in reserves had been roundtabled.[26]  Provident's "net termination ratio"

skyrocketed to well over 200%, saving it literally hundreds of millions of dollars.[27]

The internal documents never discussed using roundtables to help *pay* claims.

## V.    The Combined Effect of Defendants' Aggressive Claim-Closing Strategies Impacted Merrick's Claim

Meanwhile, Merrick's illness contributed to difficulties in his marriage, and

in the summer of 1996, his son passed away.[28]  Because Merrick's disability

benefits paled to what he had been making, he also had to significantly scale back

---

[23] EX99:1; EX113.
[24] EX99:1-2.
[25] EX49.
[26] EX104:8.
[27] EX66:1; EX73:1; EX80:1; EX95:1; EX102:1; EX104:1; EX117:1; EX135; EX49:1 ("good chance of meeting our goal of $132 million of terminations"); EX59:1.
[28] 6/18/08:202:3-16.

his lifestyle, including getting rid of his expensive house, and removing his kids from private school.[29]

Revere initially considered, but rejected, characterizing Merrick's occupation as "unemployed."[30]  Revere then began adopting Provident's other improper claims-handling practices.[31]  *Merrick*, 500 F.3d at 1012 & n.2. Consequently, after Merrick's claim hit Defendants' "2 year" target list,[32] Revere tried settling Merrick's claim for a nominal amount.[33]

When this trick failed, and knowing about the death of Merrick's son, Revere sent a field representative to visit Merrick "on a rush basis" so that it could "resolve" (*i.e.*, scrub) "this matter prior to the year end."[34]  This visit occurred just one month after a "joint training session" with field personnel concerning Defendants' improper techniques.[35]  The field agent told Merrick his claim lacked any "objective" evidence, and indicated Merrick might be sued for back benefits if he did not cooperate.[36]

---

[29] 6/18/08:136:9-20.
[30] EX174:186.
[31] EX188; EX104:8; EX122:2; ER9.
[32] EX61:1
[33] EX113; EX174:222, 231-32; ER17.
[34] EX174:508; ER17.
[35] 6/17/08:173:5-174:14.
[36] 6/18/08:138:16-139:15; EX174:524.

When Merrick refused, and still looking to "scrub" the claim by year's end, claim-handler Joanne Theodoss sent Merrick a letter on December 9, 1996, stating one and only one reason for the denial: "***we find no objective medical documentation which supports an inability to perform the duties of your occupation as a venture capitalist***."[37]  In fact, however, not only had Defendants' own medical consultant concluded Merrick suffered from an "impairment" that precluded him from working as a venture capitalist, they had obtained an IME that confirmed Merrick "could not RTW [return to work]" at that time.[38]  *See also Merrick*, 500 F.3d at 1010-11 (in-house doctor acknowledged "significant impairment," and Defendants understood IME "impl[ied] that Merrick could not return to work").

Naïvely convinced that medical evidence mattered to Defendants – and financially desperate – Merrick spent nearly three years trying to meet the "burden of proof" Defendants imposed.[39]  When he inquired what more they needed, claims personnel said, however, they could "[not] tell him what tests to have done."[40]

---

[37] EX174:525 (emphasis added).

[38] *E.g.*, 12/3/04:170:10-13; EX174:174, 269, 276, 544.

[39] *E.g.*, EX174:542-43, 558, 565, 572, 611, 657.

[40] EX174:543.

## VI. Defendants Continued Their Improper Conduct Notwithstanding Regulatory Action

In September 2003, insurance regulators from forty-nine jurisdictions commenced a "multistate targeted market conduct examination" of Defendants.[41] Regulators reviewed 299 claims closed in 2002, and detailed areas of concern that correspond to the claim-scrubbing tactics outlined above.[42] After Defendants claimed to have "changed," regulators sampled 75 more recent files from the 2003/2004 time frame, but "the level of claims handling errors was sufficient to merit further review and regulatory action."[43]

Recognizing that "further review" would only worsen their situation, Defendants promptly brokered a deal in November 2004, that precluded any further review of their files for purposes of assessing sanctions.[44] They agreed instead to monitoring on a *going forward* basis, and a nominal $15 million fine (Defendants had expected $50 million).[45] Defendants further agreed to re-review certain claims denied *after* January 1, 2000 (if the insureds filled out various complicated forms), and ultimately determined that *nearly half* (41%) of the 23,000 claimants who had jumped through the procedural hoops were owed

---

[41] EX235:5.
[42] EX235:7-10.
[43] 6/20/08:132:21-133:18; EX235:11.
[44] EX235:12.
[45] 6/20/08:134:6-135:5,149:15-25,152:18-20.

benefits totaling $676.2 million.[46] In the most recent follow up, regulators found continuing violations, but at an "acceptable" rate.[47] Because of restrictions imposed on regulators "[d]uring the pendency of [the] Agreement," Defendants effectively bought four years of "breathing space" with this deal.[48]

California initiated its own investigation in 2003, but did not agree to stop its review (as in the multistate exam).[49] It initially focused on claims from 2000 to 2003,[50] and found Defendants had engaged in a number of activities that "would constitute grounds" for a license suspension.[51] These practices likewise matched many of the techniques they had deployed against Merrick from 1996-2000:

- Selectively using portions of medical records and IME findings to Respondents' own advantage;

- Overruling the opinion of in-house medical personnel who supported a finding of disability . . .;

- Targeting certain types of claims for "resolution" (*i.e.*, denial or termination of benefits) in the interest of ***improving "net termination ratios* . . . .***";

- Characterizing certain disabling conditions as "self-reported" (*e.g.*, pain, limited range of motion, weakness), then ***accepting only objective test results*** to support disability . . . .;

---

[46] ER320.

[47] ER324.

[48] EX346:2-3; 6/20/08:144:21-145:4, 147:7-14.

[49] 6/20/08:135:1-5.

[50] EX326:6.

[51] *See* EX327:1; 6/16/08:157:21-158:1.

- ***Failing to document*** claim files adequately regarding the so-called ***"roundtable" sessions*** at which substantive claims decisions were made;

- [U]nfairly ***shifting the burden*** of investigation to the claimant;

- Compelling a claimant to accept an unreasonably ***low settlement offer*** through the above means and others, or resort to litigation.[52]

With its more expansive review, California fined Defendants $8 million as part of a settlement, but it has continued to find violations.[53]

## VII. Merrick's Nine Years' of Litigation with Defendants

In April 2000, Merrick sued Defendants for breach of contract and breach of the duty of good faith and fair dealing. In response, Defendants manipulated Merrick's claim file to minimize their liability. *Merrick*, 500 F.3d at 1014-15 & n.3-4.

### A. The 2004 Trial

The case proceeded to trial in December 2004 (one month after Defendants entered into the multistate settlement). The evidence overwhelmingly substantiated that Merrick could no longer work in his occupation due to a significant impairment.[54] Although Defendants told Merrick they had terminated his claim for a lack of "objective evidence," Defendants' witnesses admitted that

---

[52] EX327; 6/16/08:162:24-165:20.
[53] EX327:5; ER311-312.
[54] *E.g.,* EX174:35-36, 70-71, 116, 160, 201-02, 212, 218-28, 535-38; 6/17/08:192:14-22.

(1) his policy had no "objective evidence" requirement,[55] and (2) the claim file included "objective" evidence of disability.[56] Defendants' witnesses also neither disputed their good-faith obligations, nor defended the tactics they deployed to deny claims.

Unable to defend the merits of their conduct, Defendants instead attacked Merrick as a fraud, and argued that his claim should have been denied for a variety of reasons nowhere mentioned in the claim file. They tried convincing the jury that Merrick gave up his lucrative career, his expensive home, his ski getaway, and his children's top-of-the-line education, so instead he could receive $144,000/year in benefits.[57]

The first jury found that Defendants had breached the insurance contract, had acted in bad faith, and assessed $10 million in punitive damages.[58]

## B.    The Appeal

Defendants appealed, but did not challenge the jury's disability finding. Defendants also waived any challenge to the sufficiency of the bad faith evidence, and instead sought a new trial on bad faith and punitive liability. They also requested a new trial on punitive damages because the jury had not been told how to use certain evidence in calculating the amount of punitive damages. This Court

---

[55] 12/9/04:68:2-7.
[56] 12/9/04:29:25-30:10.
[57] *See generally* Appellee's Answering Brief dated 6/7/06.
[58] D280.

rejected Defendants' request for a new trial on bad faith and punitive liability, and remanded for a new trial on punitive damages. *Merrick*, 500 F.3d at 1012-18.

## C.     The 2008 Trial

### 1.     Judge Mahan's Ruling Concerning the Scope of Trial and the Use of Evidence Like the Claim File

In June 2008, Judge Mahan re-tried the case, making clear at the outset that the second trial would be akin to a sentencing hearing – limited to determining the amount, if any, of Defendants' punishment.[59]  Defendants resisted, making clear they intended to retry issues previously decided, to rely upon evidence that they did not know about when they denied Merrick's claim, and to suggest Merrick was not disabled.

Judge Mahan accordingly made several important rulings and clarifications: *First*, although in a breach of contract action any information concerning breach may be relevant, Defendants' breach had already been determined. Reprehensibility, in turn, depended on Defendants' state of mind when they denied Merrick's claim.  Accordingly, information that had to do with *whether* Merrick was disabled could only be relevant *if it reflected on "their state of mind" when they denied the claim*.[60]

---

[59] 6/4/08:3:5-4:11.
[60] 6/4/08:11:2-17:7; D418; ER42.

14

***Second***, because it had already been established that Defendants had denied the claim in bad faith, Defendants could not claim they acted reasonably in denying Merrick's claim. Defendants could not properly claim they had done nothing wrong because, like in a sentencing hearing, "the parties already ha[d] litigated whether the defendant[s] committed the crime." *Stenson v. Lambert*, 504 F.3d 873, 890 (9th Cir. 2007).

Additionally, because the claim file set forth one and only one reason for their denial – lack of "objective" medical evidence – to the extent they sought to assert that other less reprehensible reasons motivated their denial, Defendants would need to lay the requisite foundation through a witness involved in their decision making (which they never did).

### 2.     The Parties' Theories and Evidence

With these clarifications, Merrick presented the above evidence showing why Defendants should be punished. In the end, the evidence – far more extensive than the first trial[61] – left no doubt about the reprehensibility of Defendants' conduct.

Given the limited scope of the retrial, one would expect Defendants to have accepted responsibility, while seeking to minimize their punishment. Instead, they deployed a wildly improper defense, suggesting again that Merrick had

---

[61] *E.g.*, EXS:23-350.

fraudulently sought disability benefits, and that they acted reasonably in handling his claim (*e.g.*, Merrick was looking to file a claim, not because he was disabled, but "because . . . [h]is partners had thrown him out").[62] Although Defendants would periodically claim this evidence related to their "state of mind" in denying the claim, they never provided any foundation for these claims. Defendants further pressed – in the face of overwhelming evidence to the contrary – that they had never done anything wrong, but if they did, they had changed their ways. Yet no one from the Insurers testified concerning what changes, if any, they had implemented to reform, and no one on their behalf acknowledged any past wrongdoing. They even avoided having those involved with terminating Merrick's claim testify, and instead brought in paid experts and other witnesses with little or no connection to Merrick's claim.[63]

After hearing the evidence – including that concerning the multistate exams and settlements –the jury found that the amount necessary to deter and punish Revere and Provident was $26 and $36 million, respectively.

### 3. Defendants' Post-Trial Motion

Defendants filed a motion challenging the punitive damages award as excessive under the due process clause, but did not ask for a new trial on the basis of any evidentiary, instructional, or other error. After extensive briefing, Judge

---

[62] 6/16/08:105:3-5.
[63] 6/25/08:79:24-80:1, 102:19-21, 113:20-114:1.

Mahan reduced the punitive award against Provident to $26,394,765.39, which amounted to a 9:1 ratio.[64]

## ARGUMENT SUMMARY

Reduced to its essence, this appeal involves two issues: (1) should the Court remand for a third trial, and (2) should the Court reduce the punitive damages award against either Revere or Provident?

On the first issue, if Judge Mahan erred by conducting a trial limited to determining the extent, if any, of Defendants' punishment, Merrick agrees the Court should reverse and remand for a new trial. If, however, Judge Mahan correctly construed the mandate, then what Defendants label as "errors" involve their ongoing efforts to circumvent (1) this Court's mandate, and (2) Judge Mahan's effort to enforce it.

As set forth in Argument § I, Judge Mahan correctly construed the mandate. This Court (1) found "there was substantial evidence before the jury that *the insurers should be liable for punitive damages*," *Merrick*, 500 F.3d at 1013 (emphasis added), (2) reversed solely due to "misguidance regarding the way the jury may [have] use[d] evidence in *setting an amount*," *id.* at 1018 (emphasis added), and (3) "remand[ed] for a new trial on punitive damages" (*i.e.*, the extent,

---

[64] ER40.

17

if any, of Defendants' "punitive liability"), *id.* at 1009-10, 1018.  Defendants' arguments simply ignore the decision's overall context and language.

Defendants other alleged errors also go nowhere.  Defendants complain about Judge Mahan's ruling concerning Young Mee Merrick, but (1) Judge Mahan urged them to proceed in accordance with Fed. R. Civ. P. 60 to see "whether there's any merit to this or not," (2) they declined to do so, and (3) they then nevertheless sought to attack the verdict that Merrick was disabled – an issue that had become final.  Argument § II(B).

Defendants contend that Judge Mahan limited their use of the claim file, but they ignore that he did so only ***after*** counsel repeatedly violated court orders by attempting to suggest that Merrick sought benefits not because he was disabled, but because, for example, "[h]is partners had thrown him out," [65] (*i.e.*, he was fabricating his claim).  *See* Argument §§ II(C)(1), IV(C)(1).  Indeed, by the time they questioned their expert DiLisio, they had discussed the claim file so extensively that Judge Mahan found the evidence "cumulative."  Nevertheless, Judge Mahan again permitted further questioning on this topic, but was forced to end it after (1) he warned them not to have DiLisio quote from the claim file (as they had been doing with other witnesses), (2) Defendants agreed not to do so, and (3) they nevertheless did so.  In the end, Defendants extensively discussed the

---

[65] 6/16/08:105:2-6.

claim file with their witnesses, argued it in closing, and the entire file was admitted. Argument § IV(C)(2). Judge Mahan's rulings concerning Merrick's other insurer (Northwestern), the so-called "after acquired" evidence, and the admissibility of Defendants' claim-scrubbing techniques were likewise well within his discretion. Argument § II(C)(2-4).

Defendants' complaint that Merrick's expert, Stephen Prater, briefly mentioned some of the other verdicts entered against the Insurers ignores that (1) they raised the issue, (2) they never made a proper objection, and (3) Judge Mahan gave a curative instruction formulated in accordance with his discretion. Argument § III(A). Similarly, Plaintiff's request for a specific amount of punitive damages in closing was not error, but good practice. Defendants cite nothing under Nevada or federal law that precludes such a request, and indeed such requests are common practice. Argument § III(B).

Defendants' argument that Judge Mahan erroneously instructed the second jury that its punitive award, if any, need not "bear a fixed ratio relationship" to the first jury's compensatory award, comports with Nevada law and Ninth Circuit precedent, and conveys nothing in terms of setting the award to any particular amount. Argument § III(C).

Defendants' remaining complaints about judicial misconduct actually involve their repeated attempts to circumvent this Court's and the district court's

prior rulings, and Judge Mahan's appropriate efforts to enforce them. Argument § IV.

As for the punitive award, Defendants largely ignore the controlling "rough framework" in this Circuit, which Judge Mahan correctly applied.[66] Defendants simply ask this Court to disagree with the reprehensibility assessment of the judge who sat through two trials and saw and heard the extensive evidence first hand. The fact is, because Defendants' bad faith techniques reap them such enormously huge profits, a high ratio is necessary to further the legitimate interests of punishment and deterrence, and Judge Mahan's findings in this regard are not clearly erroneous. Argument § V.

Approximately thirteen years ago, Defendants terminated Merrick's disability benefits in bad faith, and he has been battling with them since that time to enforce his rights. During this same time, despite repeated warnings from many courts (including this one), Defendants have continued to engage in reprehensible – but highly profitable – misconduct. Merrick is now 66 years old and remains very ill.[67] The time has come for this Court to affirm.

---

[66] ER35.
[67] 6/18/08:134:13-135:20.

# ARGUMENT

## I. The District Court Correctly Limited the Retrial to the Amount of Defendants' Punitive Liability

### A. Standard of Review

This Court reviews *de novo* (1) "a district court's compliance with the mandate of an appellate court," *United States v. Kellington*, 217 F.3d 1084, 1092 (9th Cir. 2000), and (2) the preclusive effect of a prior judgment, *Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1377 (Fed. Cir. 2008).

### B. This Court's Mandate and Issue Preclusion Required Judge Mahan to Limit the Retrial to the Amount of Defendants' Punitive Liability

#### 1. Whether Judge Mahan Correctly Limited the New Trial's Scope Depends on the Issues Resolved in the First Appeal

In construing a mandate, "the ultimate task is *to distinguish matters that have been decided on appeal*, and are therefore beyond the jurisdiction of the lower court, from matters that have not." *Kellington*, 217 F.3d at 1093 (emphasis added). Similarly, under the "law of the case doctrine," whenever an appellate court decides a legal issue, explicitly or by necessary implication, such issues are generally *not* open to relitigation in subsequent proceedings in the same case. *See United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1186-87 (9th Cir. 2001). Lastly, when a partial *judgment* becomes final (as in this case), the doctrines of claim and issue preclusion apply. *See generally* 18 James Wm. Moore et al., *Moore's Federal Practice* § 131.13[3] (3d ed. 1999).

21

The particular preclusion law that applies is that of "the State in which the federal diversity court sits." *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001). Nevada law and federal law are substantially similar; issues and claims litigated between the parties become binding in subsequent litigation. *See Holcombe v. Hosmer*, 477 F.3d 1094, 1097-98 (9th Cir. 2007) (discussing Nevada law); *Tahoe-Sierra Pres. Counsel v. Tahoe Regional Planning Agency*, 322 F.3d 1064, 1081 (9th Cir. 2003) (federal law); *LaForge v. State of Nevada*, 997 P.2d 130, 133 (Nev. 2000) (issue preclusion under Nevada law requires identical issues and parties and a final ruling on the merits); *Segal v. Am. Tel. & Tel. Co.,* 606 F.2d 842, 845 (9th Cir. 1979) (same federal standard).

### 2. The First Appeal Expressly Rejected Defendants' Request for a New Trial on Punitive Liability and Damages

In this case, the Court rejected Defendants' request for a new trial on punitive liability under Rule 59, and specifically held that "***there was substantial evidence before the jury that the insurers should be liable for punitive damages.***" *Merrick*, 500 F.3d at 1013 (emphasis added). Thus, the issues "beyond the jurisdiction of the lower court" on remand included that Defendants were liable for punitive damages. *Kellington*, 217 F.3d at 1093.

Furthermore, after affirming Defendants' punitive liability, *Merrick* explained the instructional "error stems from misguidance regarding the way the jury may use evidence ***in setting an amount***." 500 F.3d at 1018 (emphasis added).

Having emphasized the error affected only the amount of punitive damages, *Merrick* concluded the discussion by "remand[ing] the case for a new trial on punitive damages." *Id.* at 1018. This language, and its focus on the amount of punitive damages, matched what *Merrick* said at the outset: "We affirm in part, reverse in part, and remand for a new trial on punitive damages due to the district court's failure to give an adequate **limiting** jury instruction under *Williams.*" *Id.* at 1011 (emphasis added).

Within this context, the Court summarized its remand at the end of the opinion by saying "[w]e vacate the punitive damages verdict and remand for a new trial on punitive liability." *Id.* at 1018. Standing alone, this phrase is ambiguous; "liability" may mean (1) "moneys owed; debts or pecuniary obligations," or (2) "the state or quality of being liable." *See* Webster's New Universal Unabridged Dictionary (2d ed. 2003). The overall context of the opinion, however, clarified that *Merrick* remanded to determine the pecuniary obligation for which Defendants are liable, *i.e.*, **the amount of their punitive liability** – not the threshold question of whether their conduct gave rise to the "state or quality of being liable" for punitive damages. Indeed, a remand for a new trial on whether Defendants' conduct satisfied the liability standard would contradict the Court's other findings, including its rejection of a new trial on punitive liability. 500 F.3d at 1014. Moreover, the Court did not remand for a new trial on "punitive liability

23

*and damages*." As Judge Mahan correctly concluded, the decision is "clear . . . if you read the whole opinion."[68]

### 3. Judge Mahan Appropriately Gave Preclusive Effect to this Court's Finding Concerning Punitive Liability

The preclusive effect of the affirmed judgment confirms Judge Mahan's conclusion. Issue preclusion forecloses re-litigation of "an issue of fact or law [that] was actually litigated and determined by a valid and final judgment." *LaForge*, 997 P.3d at 133 (citation omitted). In this case, the first jury *separately determined* that each Defendant had "act[ed] with oppression, fraud, or malice, express or implied, in its dealings with plaintiff such as to justify an award of punitive damages."[69] Defendants forfeited any right to challenge the sufficiency of the evidence concerning this punitive liability finding by failing to make the requisite Rule 50 motions, *see Merrick*, 500 F.3d at 1013, and this Court rejected Defendants' alternative request for a new trial, *id.* at 1013-14. Consequently, the finding that Defendants' conduct "justif[ed] an award of punitive damages,"[70] was entitled to preclusive effect in the second trial. *Cf. United States v. Comprehensive Drug Testing*, 579 F.3d 989, 997 (9th Cir. 2009) ("Judge Mahan" correctly gave preclusive effect to prior orders determining that the government "callously disregarded" certain constitutional rights).

---

[68] 6/4/08:18:24-25, 18:3-5 ("in context . . . it is clear.").
[69] D280:2.
[70] D280:2.

#### 4. The Opinion's Limited Remand Is Consistent with *White v. Ford*

Judge Mahan's interpretation of the mandate is also consistent with this Court's only other decision involving a remand for a new trial due to a *Williams*-type instructional error. *Compare White v. Ford Motor Co.*, 500 F.3d 963, 966, 971 (9th Cir. 2007) ("remand[ing] for a new trial on punitive damages" in light of *Williams*, and holding that "the district court did not abuse its discretion by telling the jury that this court 'upheld' the first jury's [punitive] liability findings"). Given the identical nature of the issues, it would be unfair to construe the remand in this case differently than *White*.

### C. Defendants' Arguments Concerning the Remand Largely Miss the Point

#### 1. No Inference Can Be Drawn from the Denial of the Motion for Clarification

Defendants understandably say very little about *Merrick's* actual language, and instead emphasize the denial of Merrick's Motion for Clarification or Rehearing. But that motion merely sought ***clarification*** because "the parties disagree[d] about what the panel intended with respect to the retrial on punitive damages . . . ."[71] Although Merrick's Motion indicated that "Plaintiff believes the Panel intended to treat this case the *same* as *White*," it asked the Court to "clarify its intent, and whether it intended to remand for a retrial on the *amount* of punitive

---

[71] SER Tab B.

damages as in *White*, or for a retrial on punitive liability and the amount of damages."[72]  The Court's decision to not clarify its intent adds nothing to the analysis.

### 2.    N.R.S. § 42.005 Is Irrelevant

Defendants' alternative contention (at 13-14) that N.R.S. § 42.005 required a retrial on punitive liability and damages fails for three reasons.

First, this procedural argument ignores that "federal courts sitting in diversity [jurisdiction] apply state substantive law ***and federal procedural law***." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) (emphasis added); *see also Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) (district court erred by allowing "California law to trump Federal Rule 50") (citation omitted).

Second, Defendants did not suggest following Nevada's procedure in the first trial.  (Doing so would have required a trial on punitive liability, and "a subsequent proceeding . . . to determine the amount of such [punitive] damages to be assessed."  N.R.S. § 42.005(3).)  By implicitly agreeing that it does not apply, Defendants have waived any right to now claim Nevada procedure applies. *Munoz v. County of Imperial*, 667 F.2d 811, 817 (9th Cir. 1982) ("We need not and

---

[72] SER Tab B.

do not consider a new contention that could have been but was not raised on the prior appeal.").

Third, section 42.005(3) merely addresses how punitive damages must be determined in the first instance; the statute does not purport to limit an appellate court's discretion to order a limited retrial on either liability or damages. It trumps neither issue preclusion nor law of the case.

### 3. Federal Law Does Not Require a New Trial on Punitive Damages and Liability

Defendants alternatively contend, citing *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494 (1931), that federal law required ignoring the jury's (affirmed) finding of punitive liability in the second trial. But again, Defendants never advanced any such contention in the first appeal, and *Merrick* has already resolved the scope of retrial issue. Furthermore, *Gasoline Products* expressly "h[e]ld that, where the requirement of a jury trial has been satisfied by a verdict according to law upon one issue of fact, that requirement does not compel a new trial of that issue even though another and separable issue must be tried again." 283 U.S. at 499.

Decisively, when an error affects only the ***amount*** of punitive damages, federal courts, including the Ninth Circuit, routinely remand for a new trial on the amount of punitive damages. *See, e.g.*, *White*, 500 F.3d at 971; *Maxey v. Freightliner Corp.*, 727 F.2d 350, 352-53 (5th Cir. 1984) ("any new trial granted

should be limited to the issue of the amount of exemplary damages" because sufficient evidence support jury's punitive liability finding) (citation omitted); *Levinson v. Prentice-Hall, Inc.*, 868 F.2d 558, 565 (3d Cir. 1989) (error "only related to . . . [the punitive damages] computation . . . new trial will not resurrect . . . liability for punitive damages"); *Defender Indus., Inc. v. Northwestern Mut. Life Ins. Co.*, 938 F.2d 502 (4th Cir. 1991) (remanding for a new trial only on punitive amount); *DeRance, Inc. v. PaineWebber Inc.*, 872 F.2d 1312, 1331 (7th Cir. 1989) (same); *Spaeth v. Union Oil Co. of Cal.*, 710 F.2d 1455, 1460 (10th Cir. 1983) (same).

Given the circumstances of this case – (1) a trial where the jury separately determined punitive liability and damages, (2) the appellate court affirmed the trial court's denial of a new trial on punitive liability, and (3) Defendants waived any challenge to the sufficiency of the evidence supporting punitive liability – this Court and the district court had the discretion to limit the new trial to the amount of Defendants' punitive liability. *Cf. Maxey*, 727 F.2d at 352 (appellate court had discretion to limit new trial "to the issue of the amount of exemplary damages to be awarded" where "the jury's findings on questions relating to liability were based on sufficient evidence and made in accordance with law") (citation omitted).

### D. Requiring Defendants to Live with Their Own Request Is Not "Profoundly Unfair"

Defendants' final contention (at 15) – that they faced an unfair "tilted playing field" – is frivolous. Defendants *requested* a new trial on punitive damages, and never once suggested that such a new trial must include revisiting punitive liability until *after* this Court affirmed their punitive liability. Furthermore, telling the second jury that the first jury had found Defendants "act[ed] with oppression, fraud, or malice" was not only accurate, but consistent with *White*. *See* 500 F.3d at 975.

Indeed, even a criminal defendant has no right to challenge guilt in the sentencing phase because at "the sentencing phase, the parties already have litigated whether the defendant committed the crime." *Stenson*, 504 F.3d at 890. Consequently, "sentencing 'traditionally concerns *how,* not *whether,* a defendant committed the crime.'" *Oregon v. Guzek,* 546 U.S. 517 (2006) (holding that "residual doubt" is not a mitigating factor). Because Defendants requested a new trial on punitive damages they cannot legitimately complain of the limitations they faced in this case.

They also greatly exaggerate them. For example, they told the second jury that "you do not have to award any punitive damages."[73] Judge Mahan also instructed the jury that "[y]ou must separately decide *whether* to award punitive

---

[73] 6/16/08:65:1-5.

damages against each defendant," and that "**you may, *but are not required, to*** ***award punitive*** or exemplary damages against either or both defendants."[74] Having gotten the new trial they requested, Defendants should not get yet another bite at the apple.

## II.     Judge Mahan Acted Well Within His Discretion by Precluding Irrelevant, Duplicative, and Improperly Prejudicial Evidence

Contrary to Defendants' contentions, Judge Mahan acted well within his discretion by managing the evidence, particularly given Defendants' repeated efforts to violate every ruling with which they disagreed.

### A.     Standard of Review

To reverse on the basis of an evidentiary ruling, the Court must conclude the district court abused its discretion, and find the error prejudicial. *Tritchler v. County of Lake*, 358 F.3d 1150, 1155 (9th Cir. 2004). Prejudice means that, more probably than not, the lower court's error tainted the verdict. *McEuin v. Crown Equip. Corp.*, 328 F.3d 1032, 1028 (9th Cir. 2003).

---

[74] D506 (#10, 13, 14) (emphasis added).

### B.     Young Mee Merrick:  Judge Mahan Properly Rejected Defendants' Collateral Attack on the Prior Judgment

#### 1.     Pertinent Background

During the first trial, Defendants repeatedly called Merrick a "fraud" and his wife a liar.[75]  After the jury rejected these contentions, Defendants filed an *ex parte* motion alleging that Merrick's wife (who planned to divorce Merrick and knew of Defendants' trumped up fraud theory from trial), asked for $5 million in exchange for helping Defendants "prove" that Merrick was not disabled.[76]  The "emergency" motion (filed five days ***after*** the notice of appeal deadline had passed) asked the trial court to extend the appeal deadline 30 days to permit discovery and the filing of a motion under Fed. R. Civ. P. 60(b) ("**Rule 60**") to set aside the judgment as fraudulent. [77]

During a hearing the next day, the trial court denied Defendants' request for emergency relief because there was no "emergency."[78]  He urged Defendants to

---

[75] *See, e.g.*, 11/30/04:139:24-140:5 (Merrick "has nothing wrong with him. Not only that, that his conduct rises to a level at least upon that of insurance fraud."); 12/13/04:103:10-12 (He "got his wife on that stand to lie to you . . . [t]hat's what he did."); *see also* D399.

[76] 7/12/05:2.

[77] D399:52.

[78] 7/12/05:25:8.

proceed in "orderly fashion" in accordance with Rule 60 to see "whether there's any merit to this or not."[79]

The following day, Defendants filed an (untimely) notice of appeal, but subsequently obtained an extension after Merrick filed a motion to dismiss the appeal.[80] Defendants subsequently never challenged Merrick's disability on appeal, and never filed a Rule 60 motion.

After the appeal – over 30 months after filing their "emergency" motion – Defendants sought to reopen discovery to explore Young Mee's "post-judgment confession of perjury."[81] The trial court denied that request, explaining that in light of the first verdict, the evidence is not relevant, and further "that she said, well, I'll testify, give me $5 million, I think undercuts this testimony. I think under Rule 403 the prejudice would outweigh the probative value . . . .."[82]

## 2. The Trial Court Had the Discretion to Deny Defendants' Discovery Requests and Exclude "Evidence" Concerning the Offer to Testify for $5 Million

Defendants nevertheless contend (at 17) that Judge Mahan erred by declining to permit them to develop and introduce evidence concerning Young

---

[79] 7/12/05:25:3-12 ("there is an orderly process set out in the rules. Let's follow that . . . let's track it down and see what happens and whether there's any merit to this or not, all right?"); 7/12/05:13:23-14:5, 22:21-25 ("I don't know why it's such an emergency that we have to say, stop, give us more time to file a notice of appeal . . . . File a Rule 60 Motion.").

[80] D353.

[81] OB18; *see also* D398.

[82] ER633.

Mee's offer to testify for $5 million because it would tend to show that Merrick was not disabled. But it is axiomatic that "[a] party who fails to utilize the appropriate statutory procedure for direct attack on a judgment will be barred by the claim preclusion doctrine from asserting a new claim in a different proceeding to accomplish the same end." Moore's § 131.02[1]. In this case, Defendants neither appealed the disability issue, nor pursued Rule 60 relief – the appropriate "procedure" to "direct[ly] attack" the Judgment. *Id.* Consequently, Judge Mahan had the discretion to preclude Defendants from collaterally attacking Merrick's disability in the second trial.

Tellingly, Defendants even acknowledge (at n.3) that they could not "vacate the first judgment" on the basis of fraud, but argue they could "investigate this issue for the purposes of the new trial on punitive damages." But their argument – that "if his disability claim is fraudulent," then they (somehow) acted less reprehensibly – rests precisely on re-litigating Merrick's disability. Furthermore, whether Merrick's claim was fraudulent has nothing to do with the reprehensibility of Defendants' conduct because their conduct must be judged in light of what they knew when they denied his claim, not some new revelation about their victim. *See, e.g.*, *Buzzard v. Farmers Ins. Co.*, 824 P.2d 1105, 1109 (Okla. 1991) ("The knowledge and belief of the insurer during the time period the claim is being reviewed is the focus of a bad-faith claim."); *Zilisch v. State Farm Mut. Auto. Ins.*,

995 P.2d 276, 280 (Ariz. 2000) (bad faith liability does not depend on the "ultimate merits"); *State Farm Fire & Cas. Co. v. Balmer*, 891 F.2d 874, 876 (11th Cir. 1990) (same); *Aetna Life Ins. Co. v. Lavoie*, 505 So. 2d 1050, 1053 (Ala. 1987) (same) (citing cases).

Furthermore, Defendants do not even challenge Judge Mahan's finding that "under Rule 403 the prejudice would outweigh the probative value."[83]  As he understood, if called to testify, Young Mee would "invoke" her Fifth Amendment rights because offering to give false testimony in exchange for $5 million could itself expose her to criminal liability, and thus her non-testimony would shed no light on Merrick's conduct.  He further noted that "somebody that calls up and says I'm willing to testify, tell you the truth, the whole truth and nothing but the truth for $5 million, that's a little suspicious." [84]  Judge Mahan's decision to avoid these tangential, irrelevant, and prejudicial issues fell well within the broad range of his permissible discretion.

### C. Judge Mahan Properly Controlled the Presentation of Evidence in the Face of Defendants' Repeated Attempts to Misuse Evidence

Continuing their "shot gun" approach, Defendants rattle off five more alleged evidentiary errors (at 19-20), but in doing so again ignore that certain issues – like Merrick's disability – could not be re-litigated in the second trial.

---

[83] ER633, 665.
[84] 7/12/05:12:7-10; *see also* 7/12/05:10:11-16.

Indeed, Defendants seem to include such issues not because of their merit, but because they fit Defendants' spin concerning Judge Mahan.

### 1. Judge Mahan Properly Limited Defendants' Attempt to Relitigate Merrick's Disability

Defendants claim (at 19) that Judge Mahan "repeatedly precluded" them "from referencing evidence in the claim file suggesting that plaintiff was not disabled," but the only ruling they identify is the one made during opening statements that they later claim constitutes "judicial misconduct." *Cf.* Circuit Rule 28-2.5 (appellant must state "where in the record on appeal the objection and ruling are set forth"). As explained in § IV(C)(1), Judge Mahan acted well within his discretion concerning this ruling (and the claim file "generally").

Moreover, and contrary to Defendants' contention, Judge Mahan gave them significant latitude concerning references to the claim file, allowing them to argue it in opening,[85] throughout trial,[86] and in closing.[87] It became so repetitive that Judge Mahan found the evidence "cumulative,"[88] particularly because "everything in the claim file is in evidence already."[89]

---

[85] *E.g.*, 6/16/08:105:6-113:18.
[86] *E.g.*, 6/23/08:45:13-48:10, 50:3-9 ("Mr. Prater had indicated that he thought that this was a close call, and do you have another opinion? A. I would say that it wasn't.").
[87] 6/23/08:79:3-23, 81:6-20, 101:15-16.
[88] 6/23/08:221:24-222:7.
[89] 6/23/08:219:25-220:9; 6/25/08:82:3-20.

### 2. Judge Mahan Had the Discretion to Exclude the Irrelevant and Confusing Evidence Concerning Merrick's Other Disability Insurer (Northwestern)

Defendants' complaint (at 19-20) that Judge Mahan excluded references to Northwestern, Merrick's other disability insurer, likewise misses the point. Northwestern had initially denied, but later paid Merrick's claim.[90]  In the first trial, Judge Mahan excluded evidence concerning Northwestern for a variety of reasons, including that it would result in a mini-trial concerning another company's handling of a different claim governed by different standards.[91]  Nevertheless – consistent with his tendency to give Defendants wide latitude – Judge Mahan initially permitted certain references to Northwestern.  But when it became clear that delving into Northwestern simply caused confusion and potential prejudice, he ended further inquiry:  "What Northwestern Mutual [did] and how they handled their claim is not relevant here, and so I'm going to cut off this line of inquiry pursuant to the ruling I made before trial in a motion in limine."[92]  Defendants did not appeal this ruling.

In the second trial, Judge Mahan (with a better understanding of the issue), precluded any "mention of the Northwestern claims file or documents contained

---

[90] 11/15/04:91:7-92:13 (Northwestern paid claim).
[91] 12/6/04:23:20-24:13; *see also* 11/15/04:91:7-92:13(evidence misleading); 11/15/04:87:20 (risk of unfair prejudice).
[92] 12/6/04:31:4-10.

within it . . . ."[93]  Although Defendants knew they could not challenge this ruling (given the prior appeal), they sought to circumvent it by emphasizing references in Merrick's claim file to Northwestern (which would cause the very confusion over tangential issues that Judge Mahan intended to avoid).  Remarkably, it is this corollary ruling Defendants now appeal.

But as Judge Mahan understood, references to what Northwestern did in connection with a ***different claim*** made under a ***different policy*** with materially ***different terms*** (even if in the claim file) would create far too many extraneous issues, and bore no relevance to the amount of punitive damages necessary to punish and deter Defendants.

Furthermore, Defendants' justification for introducing this evidence – that it would show "***how*** defendants learned that plaintiff was planning to return to work" – makes no sense.  In particular, it matters not ***how*** Defendants learned Merrick might return to work (in a different occupation), but rather ***that they learned*** the information.  On the latter point, the jury repeatedly heard that the claim file indicated "the insured [was] actively looking for work when they went to

---

[93] D417(9:1-2); ER41.

offer four months of benefits . . . ."[94]  Judge Mahan acted well within his discretion

by limiting irrelevant, extraneous, and unfairly prejudicial information.[95]

### 3. Judge Mahan Properly Excluded Evidence Gathered After the Litigation Ensued That Did Not Impact Defendants' Conduct in Denying the Claim

Before trial, Judge Mahan granted a motion in limine to preclude admission

of evidence Defendants acquired after they denied his claim (such as certain

deposition excerpts they "placed" in the claim file).[96]  He emphasized, however,

the ruling was "still tentative depending what develops at trial."[97]  Indeed, on this

particular ruling Judge Mahan stated he would look at the evidence "on a piece-by-

piece basis."[98]

Nevertheless, Defendants never sought to admit the post-litigation evidence

preliminarily excluded.  Instead, *after the close of evidence*, Defendants sought to

make an "offer of proof relative to the witnesses that we believe we should be

allowed to utilize," which request Judge Mahan denied.[99]

---

[94] *See* 6/23/08:96:6-10, 96:11-97:6, 204:12-22.
[95] ER739.
[96] D417; ER41.
[97] 6/4/08:97:18-22.
[98] 6/4/08:44:12, 44:16-20 (although excluding post-litigation evidence "logically makes some sense . . . I'm not going to say, yes, that's it absolutely, it's written in stone"); 6/16/08:140:4-17 (clarifying no blanket ruling on this issue before first witness called).
[99] 6/24/08:221:13-223:12.

Defendants' assignment of error concerning this evidence (at 20) fails for multiple reasons, including that (1) Judge Mahan never ruled definitively on this evidentiary issue, (2) the very reason Defendants offer for the admission of this evidence – that the evidence "suggest[s] plaintiff wasn't disabled"[100] – was improper, (3) to the extent Defendants wanted to show that this evidence somehow affected their claim handling (after the claim was denied), no witness provided the requisite foundation, (4) Defendants never formally moved to re-open the evidence so they could provide any offer of proof, and (5) whether to reopen evidence for any reason lies within the trial court's sound discretion, *see Romero v. City of Pomona*, 883 F.2d 1418, 1423 (9th Cir. 1989).

### 4. This Court Already Determined Judge Mahan Had the Discretion to Enforce a Sanction Order Predicated on Defendants' Manipulation of the Claim File

Defendants' contention (at 20) that Judge Mahan could not again enforce the sanction this Court already approved ignores the basis of the sanction: Defendants manipulated the claim file by selectively producing favorable documents while withholding unfavorable documents. *See Merrick*, 500 F.3d at 1014 & n.4. To suggest that Judge Mahan abused his discretion by not permitting them to benefit from their manipulation of the discovery process in a trial concerning their reprehensibility strains credulity.

---

[100] OB20.

### 5. Judge Mahan Properly Precluded Defendants' Additional Improper and Duplicative Questioning of Yet Another Witness Concerning the Claim File

For the reasons set forth in § IV(C)(2) below, Judge Mahan had the discretion to preclude additional improper and duplicative questioning of another witness concerning the claim file.

### D. Judge Mahan Had the Discretion to Admit Evidence Concerning Defendants' Overall Scheme to Deny Policies Like Merrick's

Defendants contend (at 23) that Judge Mahan could not allow evidence of Defendants' overall scheme to terminate claims exactly like Merrick's, and instead had to limit the evidence to the particular tactics reflected in Merrick's claim file. But as this Court clarified *in this case*, "a plaintiff may offer evidence of 'harm to other victims' to show the reprehensibility of a defendant's conduct in this case." *Merrick*, 500 F.3d at 1016 (quoting *Philip Morris USA v. Williams*, 549 U.S. 346, 353-54 (2007)). Indeed, precisely because evidence like this could properly be admitted, the Court required a limiting instruction concerning its use. *Id.* at 1017.

Indeed, *State Farm's* comment concerning "[a] defendant's dissimilar acts, *independent from the acts upon which liability was premised*," *State Farm*, 538 U.S. at 422, implies that evidence of a defendant's *similar acts related to the acts upon which liability was premised* is relevant to reprehensibility. *See Williams*, 549 U.S. at 355 ("Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the

general public, and so was particularly reprehensible.").  Consequently, even if a particular tactic did not impact Merrick, tactics related to the "acts upon which liability was premised" were relevant, *State Farm*, 538 U.S. at 422; *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1014 n.11 (9th Cir. 2004) (evidence of "company-wide" policies are relevant in bad faith case involving those same policies).

## III. Defendants' Complaints About a "Series of Errors" Distorts the Record and Applicable Standard of Review

Continuing their campaign to "complain about everything," Defendants identify a "series of errors" (at 26-39) they claim "skewed" the jury's framework. The Court need not tarry long about these, as they likewise run contrary to settled precedent and the discretion afforded trial judges.

### A. Judge Mahan Had the Discretion to Overrule Defendants' Unexplained "Objection" to a Question Concerning a Topic They Raised, and to Deny Their Request for a Mistrial/Curative Instruction

Defendants' contention (at 27) that sixteen lines of testimony during the seven day trial concerning a topic they raised requires yet another trial is nonsense.

#### 1. Additional Background

During Defendants' cross of Prater, Defendants attempted to show that CSE (a company Prater described as having good claims handling practices), had received regulatory citations like them, and that "good" companies (like CSE and

thus allegedly themselves) routinely receive them.[101]  When Prater suggested CSE's violations were mostly "technical," and that the company had not been found guilty of "bad faith," Defendants' counsel said "that's not true either" and proceeded to introduce evidence of a bad faith judgment.[102]

Over Merrick's objection, the trial court then permitted Defendants to introduce a report from CSE's Presidents "that is going to show there is a multimillion dollar verdict" against CSE.[103]  Defendants extensively drilled Prater about the judgment, filling eleven pages of transcript.[104]

In light of Defendants' misleading comparison of themselves to CSE, Merrick's counsel asked on redirect whether there have "also been judgments against UNUM Provident:"

> Q.    All right.  Mr. McKennon talked about the judgment in the president's report that he said was against CSE, and then you've sort of explained what that was about, have there also been judgments against UNUM Provident?
>
> A.    Yes.
>
> Q.    And how many are you aware of?
>
> MR. McKENNON:  Objection, move to strike, your Honor. Objection.

---

[101] 6/24/08:246:16-20.
[102] 6/24/08:253:19-254:3.
[103] 6/24/08:255:6-20.
[104] ER821-831.

THE COURT:  It's a subject that you opened on cross-examination, so I'll allow it.

THE WITNESS:  I'm aware of – I don't even know how many.  At least ten big ones that I'm aware of.

Q.   All right, and the judgment range, can you give us a sense of that?

A.   Anywhere between $5 million to $84 million.

Q.   And after these – and were most of those judgements [sic] for punitive damages in terms of the monetary amounts?

A.   Yes.[105]

Plaintiff's counsel then proceeded to a new topic.[106]  Judge Mahan subsequently instructed the jury to disregard this testimony.[107]

### 2.   Standard of Review

Defendants leave unclear whether they are assigning error to Judge Mahan's overruling of their objection, his denial of their motion for mistrial, or his formulation of the curative instruction, but all three are reviewed for an abuse of discretion.  *Tritchler*, 358 F.3d at 1154-55 (evidentiary rulings and formulation of instructions); *Shad v. Dean Witter Reynolds, Inc.,* 799 F.2d 525, 531 (9th Cir. 1986) (denial of a motion for a mistrial).  Additionally, a "ruling on the admissibility of evidence, absent a timely objection, will not result in a mistrial unless the alleged error seriously affects the fairness, integrity or public reputation

---

[105] 6/18/08:89:9-90:5.
[106] 6/18/08:90:6.
[107] D506 (#17).

of judicial proceedings." *United States v. Segal*, 852 F.2d 1152, 1156 (9th Cir. 1988) (citation and internal quotations omitted).

### 3. Argument

Although Defendants "object[ed]" to Prater's testimony, they failed timely to specify *any* basis for their objection (such as Rule 403). But "a party fails to preserve an evidentiary issue for appeal not only by failing to make a specific objection, but also by making the wrong specific objection." *Morgan v. Woessner*, 997 F.2d 1244, 1260 n.18 (9th Cir. 1993) (citation omitted). Accordingly, they cannot now complain that the evidence "is both irrelevant and highly prejudicial."[108] *Id.*; *United States v. Gomez-Norena*, 908 F.2d 497, 500 (9th Cir. 1990) ("a specific objection made on the wrong grounds and overruled precludes a party from raising a specific objection on other, tenable grounds on appeal") (citation omitted).

Additionally, Defendants waited *two days* before first requesting a curative instruction or mistrial, and then only asked for rulings on these requests *a week after* Prater had testified.[109] By failing timely to specify any basis for their objection, and then delaying in connection with the curative instruction and motion for mistrial, Defendants cannot now contend Judge Mahan abused his discretion. *Cf. United States v. Dufur*, 648 F.2d 512, 515 (9th Cir. 1980) (no timely

---

[108] OB27.
[109] ER116; 6/25/08:159:18-21.

appropriate objection, and mistrial requested only "after a curative instruction was no longer timely").

Moreover, the limited testimony elicited by Merrick's counsel directly rebutted Defendants' questioning concerning prior judgments in other cases. To avoid this fatal flaw, Defendants attempt to narrowly frame the issue in terms of "whether there really was a bad-faith judgment against [CSE]."[110] But, in the context of trial, Judge Mahan had the discretion to conclude that Defendants were inviting the jury to compare them to CSE. Furthermore, he had the discretion to conclude that by doing so, they had made their own track record relevant. Judge Mahan thus had ample discretion to permit the testimony.

Defendants' suggestion that Prater's testimony required a limiting instruction is also mistaken. Defendants cite cases dating back to the late 19th and early 20th centuries, but point to no such prohibition under Nevada law. Generally, more recent cases hold that evidence of other punitive damages awards may be relevant. *See, e.g.*, *Boeken v. Philip Morris, Inc.*, 26 Cal. Rptr. 3d 638, 685, 127 Cal. App. 4th 1640, 1701 (Cal. Ct. App. 2005); *Stevens v. Owens-Corning Fiberglass Corp.*, 57 Cal. Rptr. 2d 525, 535, 49 Cal. App. 4th 1645, 1661 (Cal. Ct. App. 1996); *Gagnon v. Continental Cas. Co.*, 260 Cal. Rptr. 305, 307, 211 Cal. App. 3d 1598, 1602 (Cal. Ct. App. 1989).

---

[110] OB30.

In any event, Judge Mahan gave a limiting instruction: "You have heard testimony which referenced verdicts and/or awards from other cases against the defendants in this case. I am instructing you that you should not consider the amount of such verdicts/awards in reaching your verdict in this case."[111] Although Defendants criticize the *formulation* of this limiting instruction, they proposed a *misleading* limiting instruction that would have raised tangential issues and improperly emphasized prior awards. Prater also testified accurately concerning what he knew about certain prior awards, and did not represent that these were all of the awards, let alone discuss any post-judgment review.[112] And, Defendants could have cross examined Prater, but chose not to do so. Under these circumstances, there can be no error. *See United States v. Cardenas-Mendoza*, 579 F.3d 1024, 1030 (9th Cir. 2009) (district court had discretion to determine[] that curative instructions rather than a mistrial were the proper remedy"); *Penk v. Oregon State Bd. of Higher Educ.,* 816 F.2d 458, 465 (9th Cir. 1987) (noting court's "broad discretion" in controlling the trial).

### B. Judge Mahan Had the Discretion to Allow Plaintiff's Counsel to Request a Specific Amount of Punitive Damages in His Closing Argument

Defendants contend (at 34-36) that Judge Mahan erred by allowing counsel to ask the jury to award a specific amount of punitive damages, and allude to "due

---

[111] 6/25/08:20:25-23:12; D506(#17).
[112] *See* D497:3.

process" as the basis for that error. At trial, however, Defendants merely said it was "inappropriate" – a basis not recognized by the rules of evidence. *See Morgan*, 997 F.2d at 1260 n.18 ("[A] party fails to preserve an evidentiary issue . . . by making the wrong specific objection." (citation omitted)). Defendants also did not object to the amount requested, and thus may not do so now. *Id.*

Defendants also have never identified any rule that prohibits a plaintiff from requesting a specific amount of punitive damages, and such requests are quite common. *See, e.g.*, *Diesel Mach., Inc. v. B.R. Lee Indus.*, 418 F.3d 820, 839 (8th Cir. 2005); *Davis v. Ford Motor Co.*, 128 F.3d 631, 634 (8th Cir. 1997) (same); *Coralluzzo v. Educ. Mgmt. Corp.*, 86 F.3d 185, 186 (11th Cir. 1996).

The reliance by Defendants (at 35-36) and their Amicus (at 10-13) on "studies" merely confirms there is no legal error. As a threshold matter, these studies show that (1) the "most popular" anchor is the "compensatory damage amount," not any requested amount, Reid Hastie, et al., *Juror Judgments in Civil Cases: Effects of Plaintiff's Requests and Plaintiff's Identity on Punitive Damages Awards*, 23 Law & Hum. Behav. 445, 463 (Aug. 1999); (2) "an anchor that is greatly discrepant," "[e]xtreme," "biased or based on an attempt to influence [the juror's] judgment" tends to be rejected by jurors, Mollie Marti & Roselle Wissler, *Be Careful What You Ask For: The Effect of Anchors on Personal Injury Damages*

*Awards*, 6 J. Exp. Psych. 91, 92 (June 2001); and (3) "**lower defense rebuttals produced lower awards than did higher rebuttals**," *id.* at 99 (emphasis added).

More fundamentally, these studies cannot change that (1) the jury was told that "[a]rguments and statement by lawyers are not evidence,"[113] (2) this Court "presume[s] that the jury followed the district court's limiting instruction," *United States v. Gallenardo*, 579 F.3d 1076, 1082 (9th Cir. 2009), and (3) the jury rejected Merrick's requested number.

Lastly, requesting a number cannot create any due process issue. As explained below, the only "due process" right Defendants have is against a final judgment that exceeds the constitutional maximum. That right is protected through the type of "post-verdict review" Judge Mahan conducted in this case. *See White*, 500 F.3d at 973-74 (due process is protected through post-verdict review).

### C. Judge Mahan's Proportionality Instruction Complied with Nevada Law and Ninth Circuit Precedent

In *White*, this Court stated that a "district court ***in formulating its instruction*** should ensure that the jury is not left with the erroneous impression that its punitive damages award must be proportional to the compensatory award." 500 F.3d at 974 (emphasis added). Defendants nevertheless contend (at 37) that the district court erred in this case by formulating such an instruction. Defendants' argument fails for three reasons.

---

[113] D506(#6).

First, *White* explicitly directed trial courts as a matter of substantive Nevada law to "formulat[e]" instructions to preclude an "erroneous impression . . . ." *Id.* The best way to "formulate" an instruction is to give one. In contrast, saying nothing to the jury about the issue provides no assurance.

Second, *White* correctly explained that the jury should focus on factors that go to setting the amount in the first instance, ***not*** the legal question of the constitutional ceiling. *See id.* ("[T]he reasonable relationship inquiry is markedly different from the jury's determination of a specific amount of punitive damages"). By correctly telling the jury to focus on the factors that go to setting the initial amount (*e.g.*, the amount necessary to punish and deter), while telling it not to focus on the ratio between the compensatory and punitive damages, the jury received appropriate guidance concerning how to discharge its duty.

Third, the trial court's formulation – that the second jury's punitive award need not "bear a fixed ratio relationship" to the first jury's compensatory award – conveys nothing in terms of how to set the amount because ***any*** award of punitive damages (other than zero) would bear some "fixed ratio relationship" to the compensatory award, whether it is 1:1 or 1000:1. By telling the jury that its award need not bear any such "fixed ratio relationship," the district court actually left the jury free to award nothing. "[H]armless [instructional] errors do not require reversal." *Tritchler*, 358 F.3d at 1154.

## IV. Defendants Improperly Label as "Judicial Misconduct" Judge Mahan's Appropriate Efforts to Confine Counsel to Ninth Circuit and District Court Rulings

In their final attempt to obtain yet another trial, Defendants' lodge an over the top and wildly unjustified attack on Judge Mahan. Spewing adjectives like "visceral hostility," "egregiously combative," and "knee-jerk," Defendants now blame Judge Mahan for his effort to rein-in their repeated and improper efforts to undermine the rulings made by this Court and the district court. Indeed, from opening to closing, the defense improperly tried to re-litigate settled issues (such as the reasonableness of their claims handling) – and because they refused to comply with Judge Mahan's orders they largely succeeded. Viewed as a whole, Judge Mahan acted well within his discretion to control the presentation of evidence relevant to determining the amount of Defendants' punitive liability.

### A. Standard of Review

Although the denial of a motion for mistrial based on judicial misconduct is generally reviewed for an abuse of discretion, if the alleged misconduct has not been raised with the district court, this Court reviews only for "plain error." *See United States v. Springer*, 51 F.3d 861 (9th Cir. 1995); *cf. Mercado v. Los Angeles Unified Sch. Dist.*, 51 F.3d 281, *2 (9th Cir. 1995) ("Judicial misconduct must be particularly egregious to constitute error where counsel has failed to object.").

In this case, Defendants orally moved for a mistrial based on judicial misconduct, but failed largely to identify the issues they now raise on appeal.[114] Accordingly, most of what they now complain about is subject to plain error review. Nevertheless, Defendants' arguments fail under either standard.

## B.   Judicial Misconduct in the Civil Context Warrants Reversal Only in Truly Egregious Cases

As this Court's precedent teaches, "[v]ery few cases outside of the criminal law area support an appellate finding of general judicial misconduct during trial." *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1289 (9th Cir. 1984); *Pau v. Yosemite Park & Curry Co.*, 928 F.2d 880, 885 (9th Cir. 1991) (higher standard applies in civil cases). Indeed, "[b]ecause a trial judge has wide discretion in conducting a trial, a clear and precise showing of prejudice must be made to demonstrate judicial misconduct, particularly in noncriminal trials." *Hansen v. Comm'r of Internal Revenue Serv.*, 820 F.2d 1464, 1467 (9th Cir. 1987).

Generally, reversal is appropriate only if the record "discloses actual bias on the part of the trial judge or leaves the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality." *Shad*, 799 F.2d at 531 (citation omitted). In civil cases, the accuser generally "must show that the judge's conduct reflected a

---

[114] ER50-53 (mentioning the DiLisio "cross" and general "bias," but not any pre-trial issues, opening statements, side bars, Young Mee, or "offers of proof").

disposition, **based on extrajudicial sources**, to treat him unfairly." *Hansen*, 820

F.2d at 1467 (emphasis added).

Applying these standards, *Kennedy v. Los Angeles Police Department,* held

no new trial was required notwithstanding that the judge engaged in questioning

that "was not marked by complete indifference" and indeed was "quite pointed and

intemperate." 901 F.2d 702, 709 (9th Cir. 1990), *abrogated on other grounds by*

*Hunter v. Bryant*, 502 U.S. 224 (1991). The Court, however, emphasized that the

judge's "intemperate" conduct was prompted by "counsel repeatedly stray[ing] to

an area of questioning that the court had disallowed," and did not reflect the court's

"feelings about the case." *Id.* at 710; *cf. In re Yagman*, 796 F.2d 1165, 1178 (9th

Cir. 1986) ("there was obviously a certain amount of tension at trial, such is not

uncommon in emotional and hard-fought cases," but "[w]e have no doubt that the

plaintiffs in this case fairly received their day in court").

In *Ward v. Westland Plastics, Inc.*, this Court noted "[t]he judge exhibited

impatience with [counsel's] inept examination of witnesses," "demeaned the

quality and relevance of much of [Appellant's] evidence, suggested his own

nondiscriminatory reasons [under Title VII] for some of the employer's behavior,

and even disparaged Congressional wisdom in enacting Title VII." 651 F.2d 1266,

1271 (9th Cir. 1980). Notwithstanding this conduct, however, "the judge seldom

spoke directly to the ultimate issues," gave appropriate instructions, and the

appellant's case turned on a "lack of persuasive evidence." *Id.* at 1271-72; *see also Walker v. Sumner*, 14 F.3d 1415, 1423 (9th Cir. 1994) (new trial not warranted where judge commented that party took "a petty position," reversed the order of opening statements, and commented on evidence "throughout the trial").

To Merrick's knowledge, the Ninth Circuit has published but one civil case where judicial misconduct warranted a new trial – *Maheu v. Hughes Tool Co.*, 569 F.2d 459 (9th Cir. 1977). That case turned on the credibility of one witness: Maheu. *Id.* at 469. Within this context, the trial judge told the jury that "it is within my province as Judge to assist the jury in arriving at a just conclusion by commenting upon the evidence and upon the credibility of witnesses in this case," credibility is important, and "[t]he most important live witness that we have heard from . . . is Mr. Maheu." *Id.* The trial judge then proceeded to make personal observations about Maheu, including that he is "affable, intelligent, imaginative, articulate," "overly-trusting," and "walking paradox." *Id.* at 469-70. Given the critical nature of the credibility of this one witness and the judge's extensive comments that went directly to an ultimate fact, the judge, "in essence, [became] a personal character reference for" Maheu. *Id.* at 472.

### C. Defendants' Attack on Judge Mahan Ignores Their Own Repeated Efforts to Skirt His Rulings

Contrary to Defendants' contention, there is no "judicial misconduct" in this case, let alone misconduct sufficiently egregious to warrant a new trial in a civil

case.  What Defendants label as "misconduct" resulted largely from "counsel repeatedly stray[ing] to an area of questioning that the court had disallowed." *Kennedy*, 901 F.2d at 710.  A trial judge, however, "is more than an umpire, and may participate in the examination of witnesses to clarify evidence, ***confine counsel to evidentiary rulings***, ensure the orderly presentation of evidence, ***and prevent undue repetition***."  *United States v. Laurins*, 857  F.2d 529, 537 (9th Cir. 1988) (emphasis added).

### 1.    Judge Mahan Cut Off Defendants' Opening Only After They Repeatedly Violated an In Limine Ruling

Judge Mahan repeatedly made clear that Defendants could not (1) challenge, explicitly or implicitly, whether Merrick was "disabled," (2) suggest they "had reasonable basis to terminate Merrick's benefits," or (3) suggest that what they learned ***after*** they denied the claim somehow affected their decision. [115]  The defense nevertheless immediately began violating these orders in opening by arguing that Merrick fabricated his disability:

- In 1993, Merrick "was looking" to "file a documented disability claim ***because the venture capital world was not being good to him***.  His partners had thrown him out, and he wasn't able to get his firm off the ground," [116] (*i.e.*, he was fabricating a claim);

- Merrick saw Dr. Frohwirth, "but he didn't tell Dr. Frohwirth the truth. He didn't tell Dr. Frohwirth that the reason he wasn't working

---

[115] 6/4/08:67:14-15, 69:6-7.
[116] 6/16/08:105:2-6 (emphasis added).

anymore is because he got kicked out of his partnership,"[117] (*i.e.*, he lied to his doctor to document a claim); and

- After Merrick "finally had what he wanted, a diagnosis of chronic fatigue syndrome . . . in the claim forms no longer did you see depression . . . because you have to exclude depression in order to get that diagnosis,"[118] (*i.e.*, he lied in the claim form to support his fabricated claim).

Judge Mahan again made clear that such argument was "out of bounds."[119]

Defendants then claimed they were really trying to explain the difficult nature of the claim, but counsel immediately returned to arguing that Merrick was not disabled: "There was an independent medical examination, no finding of chronic fatigue syndrome, no finding of disability."[120] At that point, Judge Mahan "cut off" further argument about the claim file because the disability issue has been "determined."[121]

During a subsequent recess, Judge Mahan aptly observed "I gave you some latitude and you took advantage of it," which prompted further discussion that only *if there is foundational evidence that someone at the Insurers relied upon the claim file information in connection with their decision making,* does the

---

[117] 6/16/08:107:2-8.
[118] 6/16/08:112:16-113:1.
[119] 6/16/08:118:12.
[120] 6/16/08:122:12-15.
[121] 6/16/08:122:16-17.

information become relevant to reprehensibility.[122]  Defendants resumed by telling the jury for the first time that entries in the claim file "suggested to our claims people that this was not clear-cut, and they struggled with this," and "I don't have an opportunity to go through them now because I don't have enough time, but again you can go through them."[123]  Judge Mahan had the discretion to "***confine counsel to evidentiary rulings***," and "ensure the orderly presentation of evidence . . . ."  *Laurins*, 857 F.2d at 537 (emphasis added).

> **2.    Judge Mahan Limited Further Questioning of DiLisio Concerning the Claim File Only After Defendants Again Violated Court Orders**

Defendants also erroneously claim (at 43-45) that Judge Mahan abused his direction and engaged in "misconduct" in connection with Defendants' examination of their expert DiLisio.

Before DiLisio testified (and after other witnesses had testified about the claim file), Judge Mahan noted (correctly) that although he has "tried to give each" side "some latitude," any additional testimony concerning the claim file would be "cumulative."[124]  Importantly, he clarified that because "everything in the claim file is in evidence already" we would "just [be] wasting our time" to have DiLisio

---

[122] 6/16/08:127:8-25; 6/16/08:130:13-131:10 (claim file information is relevant only if someone actually relied upon it).
[123] 6/16/08:141.
[124] 6/24/08:4:5-8.

56

"go through the claim file and say, what does it say on page 4? What does it say on page 5?"[125] *Defense counsel represented "he won't do that."*[126]

The next day, toward the end of their questioning, Defendants again began violating Judge Mahan's orders, including by having DiLisio quote from the claim file (directly contrary to what had been discussed with Judge Mahan).[127] Worse, the record reflects that Defendants' counsel had *pre-arranged* for DiLisio to quote specific portions:

Q. Let's take a look at page 153 [of the claim file].

A. *That's the document that I will be quoting from, yes.*

Q. *And can you quote from it?*

A. Yes. He said, well, he conducted a . . . ."[128]

DiLisio then quoted an *identical* portion of the claim file that had been quoted the previous day.[129] At that point, Judge Mahan interrupted: "This was all covered yesterday we heard this same quotation from the file yesterday. We don't need to hear it again."[130]

---

[125] 6/23/08:219:25-220:9.
[126] 6/23/08:220:5 (emphasis added).
[127] 6/24/08:114:3-9 (DiLisio suggesting that Merrick did "not list Dr. Frohwirth on his initial claim submission" in an attempt to conceal information).
[128] 6/24/08:116:13-17.
[129] *Compare* 6/23/08:77:22-78:3 *with* 6/24/08:116:17-22.
[130] 6/24/08:118:2-4.

Nevertheless, Defendants' counsel directed DiLisio to "continue talking about what you found in the file," and proceeded to have DiLisio testify the claim file (1) "helped support the company's decision," [131] (2) "*meant [Merrick] was not totally disabled*," [132] and (3) "supported their conclusion that Mr. Merrick was not totally disabled." [133] That repeated line crossing drew an objection and a jury question asking whether disability had "already [been] determined." [134] Judge Mahan again warned "you're stepping on dangerous ground here," [135] but Defendants pressed ahead, ending their examination with DiLisio opining that "[t]here was a substantial body of evidence in my opinion to support their denial," [136] *i.e.*, Defendants acted reasonably.

Defendants' improper presentation required Plaintiff's counsel to again clarify that Defendants gave only one basis for their denial – lack of objective evidence – not the reasons DiLisio gave, and further that his testimony directly contradicted Defendants' internal conclusions concerning Merrick's impairment. [137] DiLisio ultimately admitted that he had neither "read the transcript [from] the last

---

[131] 6/24/08:118:9-10, 119:8-9.
[132] 6/24/08:119:17-20.
[133] 6/24/08:121:3-4.
[134] 6/24/08:122:24-123:1.
[135] 6/24/08:122:16-17.
[136] 6/24/08:123:21-23.
[137] 6/24/08:139:25-140:11; EX:174:174.

trial," nor "the depositions of the claims handlers,"[138] and thus had no basis to testify on what Defendants had relied upon in denying Merrick's claim.

In light of Defendants' unwillingness to comply with court orders, the duplicative nature of DiLisio's testimony, and the glaring fact that he knew nothing about what the insurers actually relied on in making their decision, Judge Mahan ended such further questioning: "Nothing about the claims file. You had a shot. He had a shot. That's the end of it. Do you remember my ruling on the motion in limine about this witness?"[139] When Defendants' counsel asked to make an "offer," Judge Mahan explained "No, no offer of proof. We had a motion in limine, and you made a representation to me that turns out to be inaccurate to put it kindly."[140]

In light of Defendants' *deliberate* violations and misrepresentations to the district court, Judge Mahan could have, at that point, sanctioned Defendants. Under the circumstances, he exercised remarkable judicial restraint, and certainly had the discretion to end what had become cumulative testimony presented in a manner that violated his orders. *Laurins*, 857 F.2d at 537 (judge may enforce rulings "and prevent undue repetition"). Indeed, throughout the trial, Judge Mahan treated Defendants fairly, sustaining many of their objections to Merrick's

---

[138] 6/24/08:136:2-16.
[139] 6/24/08:202:19-24.
[140] 6/24/08:203:2-5.

detriment,[141] telling the jury over Merrick's objection that Defendants' attorney's son graduated valedictorian,[142] and even giving Defendants the last opportunity to provide rebuttal evidence (even though he did not have to) before confirming that "both sides have rested."[143] For Defendants to now complain about Judge Mahan's rather tame response to their misconduct is frivolous.

### 3. Defendants' Other Allegations of "Misconduct" Likewise Rest on Distorting the Record

Defendants mischaracterize (at 40) what occurred during the hearing on their request to re-depose Young Mee and the motion in limine hearing. In both of these hearings, Judge Mahan indicated his view on the issues based on the parties' briefing, and the defense pressed incessantly the very positions with which he had already (correctly) indicated he disagreed.[144]

Defendants also falsely claim that Judge Mahan changed his position concerning a "blanket ruling" (depending on who advanced the argument), when in fact he made clear several times that his in limine rulings were "preliminary."[145] Defendants, not Judge Mahan, were confused. Although Defendants' constant

---

[141] *E.g.*, 6/4/08:8-17 (excluding key plaintiff witness as "too remote"); 6/17/08:14:25-15:7 (allowing evidence over objection because helps show conduct not reprehensible); 6/20/08:187:19-197:7 (sustaining defense objection after lengthy colloquy).

[142] 6/17/2008:144:25-145:18.

[143] 6/25/08:39:24-40:10.

[144] *See, e.g.*, ER603-620, 631-32, 647.

[145] ER42 ("rulings are preliminary"); 6/4/08:97:9-22.

effort to avoid various court orders tested Judge Mahan's limits, Judge Mahan acted appropriately under the circumstances.

Defendants' complaint (at 46) about "sidebars" is silly. Judge Mahan appropriately attempted to limit the number of sidebars after yet a third request was made after two back-to-back side bars and a lengthy recess.[146] At that time, Judge Mahan explained that rather than repeatedly holding sidebars, "just give me the basis for your objection and let me deal with it."[147] Consistent with their unwillingness to permit Judge Mahan to control his courtroom, the defense pressed for a sidebar (under the guise of a motion in limine violation), when they really wanted to *re-argue* another ruling with which they disagreed.[148] Judge Mahan made clear this was inappropriate:

> do not make an objection based on the [denied] motion in limine. You want to renew your motion in limine. They are two totally different things, and we just wasted time. . . . if you have an objection, make an objection. We don't need to be at side bar all the time . . . .[149]

During the fifth day of trial, Judge Mahan held two more side bars – one requested by Plaintiff and one requested by Defendants.[150] After a third side-bar was requested that day, Judge Mahan again emphasized that "[i]f there's something

---

[146] 6/16/08:113:24-121:1, 123:4-125:25, 126:17-140:19.
[147] 6/16/08:150:9-10.
[148] 6/16/08:150:5-6.
[149] 6/16/08:152:7-15.
[150] 6/23/08:48:20, 149:9-10.

confidential, then we can have a side bar, but I don't want to just go to side bar and subject the jurors to more white noise unnecessarily."[151]  Judge Mahan reacted appropriately to Defendants' misuse of sidebars.

Defendants' remaining complaints – concerning alleged ridicule, leading questions, and Judge Mahan's "lack of concern" over alleged perjury – are equally misplaced.  Courts have long recognized that "[i]f counsel were allowed routinely to lead a witness on direct examination, the evidence elicited would all too often be that of the lawyer, not of the witness.  *United States v. Bryant*, 461 F.2d 912, 918 (6th Cir. 1972) ("[t]he vice of the leading question lies in its suggestion of an answer to a witness who, having been called by the party, is presumed to be inclined to favor the questioner").[152]  As for Young Mee Merrick, Judge Mahan had urged Defendants to see whether the allegations had any "merit,"[153] but they failed to do so within the governing time limits, which shows they did not take the issue seriously.

In the end, Defendants have "fail[ed] to make the necessary showing of the type of bias which marks an unfair trial," particularly in the civil context.  *Hansen*, 820 F.2d at 1467.  There is no showing "that the judge's conduct reflected a disposition, based on extrajudicial sources, to treat [Defendants] unfairly."  *Id.*

---

[151] 6/23/08:185:13-16.
[152] 7/12/05:12:7-10; 7/12/05:10:11-16.
[153] 7/12/05:14:1-5.

There is no showing that Judge Mahan repeatedly expressed opinions on ultimate issues (like the amount of Defendants' punishment). *Cf. Maheu*, 569 F.2d at 472. To the contrary, Judge Mahan specifically instructed the jury it should reach its own decision based on the "instructions," not what "the court may have said or done . . . ."[154] And the record shows he meant it.

## V.    The Punitive Award, as Reduced by Judge Mahan, Comports with Due Process

Invoking "due process," Defendants (and their Amicus) hope to eliminate the legitimate punitive and deterrent effect the jury and Judge Mahan intended to achieve. But having had the benefit of two trials, having had ample notice from this Court that a single-digit ratio comports with due process, and having had ample notice from the Nevada Legislature that its legitimate interests require significant punitive damages awards in insurance bad faith cases involving systematic misconduct, the federal Constitution has nothing further to say about this case. Defendants' effort to convince this Court to reduce their punishment to the equivalent of a slap on the wrist rests on a demonstrably flawed analysis that runs contrary to binding Ninth Circuit precedent.

### A.    Standard of Review

This Court reviews *de novo* the district court's "application of" the law governing punitive damages awards, but it does not involve any "heightened

---

[154] D506(#1, 6).

scrutiny." *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 431 n.4 (2001) (rejecting heightened scrutiny review). To the contrary, "the Court of Appeals should defer to the District Court's findings of fact [concerning reprehensibility] unless they are clearly erroneous." *Id.* at 440 n.14.

Reviewing whether a punitive award is "grossly excessive" under the Constitution is thus similar to *de novo* review in connection with a sufficiency of the evidence challenge: the court "view[s] the facts in the light most favorable to the plaintiff." *Hangarter*, 373 F.3d at 1010; *see also Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146, 1150 (9th Cir. 2002) (the court "must accept the underlying facts as found by the jury and the district court"). The ultimate inquiry is whether, viewing the evidence in favor of sustaining the punitive award, the award nevertheless exceeds the largest amount the constitution would permit. *See Leatherman*, 285 F.3d at 1151 (Court should not reduce punitive award below "the ***constitutional maximum*** on the basis of the existing record.") (emphasis added); *Stogsdill v. Healthmark Partners, L.L.C.*, 377 F.3d 827, 834 (8th Cir. 2004) ("When a jury awards excessive damages, remittitur to the maximum amount provided is an appropriate remedy."); *FDIC v. Hamilton*, 122 F.3d 854, 861-62 (10th Cir. 1997) (reviewing court must "[s]elect[] the maximum constitutionally permissible punitive damage ratio in a given case . . . ."); *Daka, Inc. v. McCrae*, 839 A.2d 682, 701 (D.C. Cir. 2003) ("the amount to be determined

by the judge is the constitutional maximum which the jury could properly

award . . .").

Although Defendants will quibble with this standard, viewing the evidence

in the plaintiff's favor is the only standard that both respects the jury's verdict, and

brings consistency to subsequent appellate review.

## B. The Ninth Circuit's "Rough Framework" Is Controlling in This Case

In 1996, in a 5-4 decision, the Supreme Court first struck down a punitive

damages award as "grossly excessive" in violation of the Due Process Clause.

*BMW of N. Am. v. Gore*, 517 U.S. 559, 586 (1996) (145:1 ratio). Not surprisingly,

numerous justices (from the left and right), do not believe the Constitution gives a

defendant a "due process" right to have a court reduce a jury's punitive award after

fair procedures have been followed. *See, e.g.*, *id.* at 598 (Justices Scalia and

Thomas dissenting); *id.* at 607 (Justice Ginsburg and Chief Justice Rehnquist

dissenting). The criticism is sound because "the Due Process Clause" does not

seem to provide any "substantive protections against 'excessive' or 'unreasonable'

awards of punitive damages." *State Farm*, 538 U.S. at 429 (Justice Scalia

dissenting).

Nevertheless, *State Farm*, *Gore*, and their progeny remain binding precedent

that this Court must follow. Indeed, the Ninth Circuit has developed a sensible and

easy to apply "rough framework" that harmonizes prior precedent. *See Planned*

*Parenthood v. Am. Coalition of Life Activists,* 422 F.3d 949, 962 (9th Cir. 2005); *In re Exxon Valdez*, 490 F.3d 1066, 1093 (9th Cir. 2006) (in *Planned Parenthood*, the Ninth Circuit "construct[ed] a 'rough framework' for determining the appropriate ratio of punitive damages to harm"), vacated on other grounds by *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605 (2008). Under the Ninth Circuit's "rough framework," "where there are 'significant economic damages' but behavior is not 'particularly egregious,' a ratio of up to 4 to 1 'serves as a good proxy for the limits of constitutionality.'" *Exxon*, 490 F.3d at 1093 (citations omitted). "In cases with significant economic damages and 'more egregious behavior,' however, a single-digit ratio higher than 4 to 1 'might be constitutional.'" *Id.* (citation omitted). "[I]n most cases," the Constitution will not justify a remittitur. *Planned Parenthood,* 422 F.3d at 954.

This framework helps "unify precedent" and "stabilize the law," thereby bringing predictability to punitive awards. *Cooper Indus.*, 532 U.S. at 436. It also gives litigants ample notice of the kinds of punitive awards that will withstand scrutiny, the core due process concern underlying *Gore*. 517 U.S. at 574. And it respects the Seventh Amendment by providing juries considerable flexibility in determining the appropriate amount of punishment within a permissible range.

Although Defendants and their Amicus urge the Court to ignore this rough framework,[155] that is not something a three-judge panel may do. *Delgado v. Holder*, 563 F.3d 863, 871 n.12 (9th Cir. 2009).

### C. Judge Mahan Correctly Applied the Ninth Circuit's Rough Framework

Judge Mahan correctly applied this Court's "rough framework," and thoroughly explained why the punitive awards, as reduced, comport with due process.[156] His assessment of Defendants' reprehensibility should be respected. *Cooper Indus.*, 532 U.S. at 440; *cf. S. Union Co. v. Irvin*, 563 F.3d 788, 794 (9th Cir. 2008) (noting that in a punitive damages case, the trial judge "*who heard the case is in the best position to determine the facts*" and "is *analogous to a sentencing judge in a criminal case*") (Noonan, J. dissenting) (emphasis added).

#### 1. Judge Mahan Correctly Found the Defendants' Conduct Highly Reprehensible

As Judge Mahan recognized, the reprehensibility of the Defendants' conduct determines the "class of cases [within which this case lies] in the *Planned Parenthood* framework." *Exxon*, 490 F.3d 1093. Here, Judge Mahan correctly considered the overall breadth and magnitude of the Defendants' conduct, as

---

[155] OB65-66; AB14-24.
[156] ER1-40.

prescribed by applicable precedent, assessed "the credibility of witnesses," and found that Defendants engaged in "highly reprehensible" conduct.[157]

### a) Judge Mahan's Findings

Judge Mahan's detailed findings will not be repeated here, but in sum he determined that when Defendants realized that honoring the terms of their existing policies would lose them money, they set targets for the number of claims to close and systematically set out to cut off disabled persons' benefits without regard to the health and financial consequences these individuals would suffer. Defendants knew Merrick qualified for disability benefits, but because his claim fit their target profile, they cut off his benefits using a pre-textual basis. Moreover, they did so only after their efforts to exploit his emotionally fragile state failed. Defendants repeatedly lied to Merrick, sought to "hide their misconduct on an ongoing basis," acted as recidivists, and showed no repentance.[158] Judge Mahan's findings amply support a determination that Defendants engaged in highly reprehensible conduct. *Cf. Hangarter*, 373 F.3d at 1014 ("The evidence, viewed in Hangarter's favor, can support the conclusion that Defendants' conduct was in reckless disregard of the rights and the physical well-being of Hangarter; was threatening to an individual who was economically vulnerable; was part of a general corporate policy and not an isolated incident; and caused harm in a deceitful manner.").

---

[157] ER3, 28.
[158] ER24-27.

### b) Defendants Failed to Show That Judge Mahan's Findings Concerning the Reprehensibility Factors Were Clearly Erroneous

In quibbling with some of Judge Mahan's findings, Defendants fail to recognize that the "Court of Appeals should defer to the District Court's findings of fact [concerning reprehensibility] *unless they are clearly erroneous*." *Cooper Indus.*, 532 U.S. at 440 n.14 (emphasis added). And, "[t]o be clearly erroneous, a decision must strike [the Court] as more than just maybe or probably wrong; it must . . . strike [the Court] as wrong with the force of a five-week-old, unrefrigerated dead fish." *See Hayes v. Woodford*, 301 F.3d 1054, 1067 n.8 (9th Cir. 2002) (citation omitted).

Rather than confront this standard, Defendants advance legally flawed and factually improper arguments (at 52-58) concerning the *State Farm* reprehensibility factors. For example, Defendants treat the *nature of the injury* (at 52) as either physical or not. But the "spectrum" of harm analysis that applies generally, applies to every individual reprehensibility factor, including this one. As this Court has explained, "conduct causing emotional as well as economic harm can be more reprehensible than conduct causing mere economic harm." *Exxon*, 490 F.3d at 1085 (citation omitted).

Furthermore, the harm suffered from a purely economic injury (for example, the repainted automobile in *Gore*) differs dramatically from the harm suffered

when a disabled person has their benefits wrongly terminated, particularly when, like here, it is accompanied with veiled threats aimed at exploiting an individual's financial and emotional vulnerability. *See generally* 2-8 Eric Mills Holmes, *Holmes' Appleman on Insurance* 2d § 8.7 (2d ed. 1996) (a "policyholder can suffer injury not only to his economic well-being but to his emotional *and physical health as well*" from a bad faith denial) (emphasis added); *Campbell v. State Farm*, 98 P.3d 409, 415 (Utah 2004) (bad faith "is likely to cause injury more closely akin to physical assault or trauma than to mere economic loss").

As for their ***reckless disregard for the health and safety of others***, Defendants claim a clean bill of health (at 53) because they did not disregard a "risk of ***physical*** harm." But neither the Supreme Court nor this Court has so limited this factor, and common sense explains why. Defendants' conduct is so egregious, in part, because of the risks to which they exposed their disabled insureds by cutting of their benefits, ***without regard to the impact their conduct would have on the health and safety of those counting on such benefits***. Indeed, Defendants do not even dispute Judge Mahan's finding concerning their targeting of "financially vulnerable" insureds."[159]

Defendants further attempt to downplay Merrick's ***financial vulnerability***, by focusing on his wealth ***before*** he became disabled. After he became disabled,

---

[159] *Compare* ER29 *with* OB53-54.

however, he began running out of money, which Defendants sought to exploit to their advantage.[160]

Defendants claim (at 54) that Judge Mahan could not find they engaged in **repeated misconduct** because such misconduct requires "practices 'similar to that which harmed [the plaintiff]'" (quoting *State Farm*, 538 U.S. at 424). But this Court has already found the required nexus, *Merrick*, 500 F.3d at 1013-14 & n.2, and for good reason. The evidence showed Defendants targeted a **particular block** of disability policies (which included Merrick's). Defendants' systematic misconduct directed towards Merrick and others similarly situated warrants punishing Defendants as recidivists. *State Farm*, 538 U.S. at 423 ("courts should look to 'the existence and frequency of similar past conduct'") (citation omitted); *see also Hangarter*, 373 F.3d at 1014 (Defendants' misconduct was "not an isolated incident").

In denying that they engaged in "repeated acts" of **intentional malice, trickery, and deceit** (at 54-58), Defendants try to **re-argue** the bad faith findings this Court previously affirmed, and ignored the reality of this case, *i.e.*, that Defendants engaged in systematic conduct targeting "physically, mentally,

---

[160] Facts § V.

emotionally, and economically vulnerable individuals," to "deprive them of disability insurance benefits in their time of need."[161]

Similarly, Defendants try to justify the games they played with Merrick concerning "objective evidence" by suggesting they may legitimately insist on objective evidence of impairment (just not "objective evidence" of CFS). But the evidence demonstrated Defendants did precisely what they concede is improper. As a note in the claim file confessed *after* Defendants denied the claim, "we have recently denied this clm [sic] based on no objective medical data to support CFS/Lyme disease . . . ***Reviews document impairment, just not due to CFS/Lyme disease***."[162]

Big picture, Defendants (at 49-51) treat reprehensibility as though it involves counting the *number* of reprehensibility factors, rather than recognizing that a case involving extreme reprehensibility with respect to one factor may be worse than one involving a low degree of reprehensibility on multiple factors. On the basis of this oversimplification, they conclude (at 50) that this case falls at the "low end of the spectrum" like "other economic torts." That is mere wishful thinking, not reality.

---

[161] ER29.
[162] EX174:544 (emphasis added), 174.

This case involves particularly egregious conduct precisely because of (1) the wide-reaching and highly improper nature of Defendants' conduct that impacted Merrick, (2) the vulnerable population involved (disabled persons), and (3) the tactics deployed against Merrick and others (which included repeated acts of misconduct over an extended period of time, including lying, borderline harassment, veiled threats, and efforts to conceal their wrongdoing). The conduct here is "substantially more reprehensible than virtually any "economic" tort, and, because of the breadth, depth, and magnitude of the misconduct, more reprehensible that many cases involving "acts of physical intimidation."[163]

Defendants' reliance on *Leavy* – an unpublished decision with no precedential value, Circ. R. 36-3 – is misplaced. That case involved a drug addict to whom Defendants paid "every penny . . . owed without interruption."[164] The district court found the evidence of punitive liability "thin," and there was no finding of substantial evidence connecting the corporate misconduct to what happened to Leavy.[165] *Cf. Merrick*, 500 F.3d at 1013-14 & n.2. On appeal, this Court ultimately deferred to the district court's reprehensibility analysis (the same thing it should do here). *Cf. TXO Prod. Corp. v. Alliance Resources Corp.*, 509

---

[163] OB50.
[164] *See* D534:2-3 (and citations therein).
[165] D534:4 (citations therein).

U.S. 443, 457 (1993) ("Because no two cases are truly identical, meaningful comparisons of such awards are difficult to make.").

### c) Defendants' "Other Factors" and "Remedial Measures" Miss the Point

Defendants were obligated to pay Merrick's benefits, yet did so only after they were found to have acted in bad faith, and then paid under a reservation of rights.[166] Judge Mahan correctly did not give Defendants "credit" for not further breaching their contractual obligations.

As for Defendants' contention (at 60-63) that the "Unum [Provident] Family" has changed its ways, Judge Mahan ultimately reduced Provident's punitive award to give it some credit for the "ameliorative impact" of the regulatory action.[167] But nothing further was required. No one from Provident testified concerning how or why Defendants changed. Moreover, as the market conduct exams show, Defendants previously claimed they had "changed," but had not.[168]

Additionally, Nevada's interest in deterrence includes both specific and general deterrence, and the jury assessed the amount of punitive damages necessary to achieve Nevada's legitimate interests in punishment and deterrence in this case in light of the market conduct exams. Nothing required either the jury or

---

[166] ER35.
[167] ER38.
[168] *See* Facts § VI.

Judge Mahan to accept Defendants' self-serving claims of reformation –

particularly given the overwhelming evidence that contradicts those claims.

*Cf. Cooper Indus.*, 532 U.S. at 440 (noting district court's "superior vantage . . .

with respect to issues turning on witness credibility and demeanor").

> ## 2. Judge Mahan Correctly Determined That This Case Falls Within the Second Category of the Rough Framework, Making a High Single-Digit Ratio Appropriate

In light of the above, Judge Mahan's reprehensibility findings are not clearly

erroneous. He correctly concluded that this case "falls within the second tier" of

the rough "framework," making a single-digit ratio greater than 4:1 appropriate.[169]

> ### a) The Court Should Reject Defendants' Request to Ignore the Controlling Rough Framework

Defendants nevertheless urge this court (at 68-69) to apply a less than 1:1

ratio, but in doing so they rely on the same argument this Court rejected in

*Hangarter.* 373 F.3d at 1014-15 (rejecting Defendants' virtually identical "1:1

ratio" argument).

They further ask the Court to disregard controlling precedent by listing

several ***out-of-circuit*** "1:1 cases" (at 67-68). The Ninth Circuit's controlling

framework, however, is consistent with a large body of law. *E.g., Williams v.

Philip Morris*, 176 P.3d 1255 (Or. 2008) ($79 million punitive award of 97:1 in

tobacco case involving widespread corporate misconduct); *Rhone-Poulenc Agro,*

---

[169] ER35.

*S.A. v. DeKalb Genetics Corp.*, 345 F.3d 1366, 1370-72 (Fed. Cir. 2003) (a $50 million punitive award amounting to a 3.33:1 ratio "does not even approach the possible threshold of constitutional impropriety" in a case that did not involve any "disregard for the health and safety of others, a pattern of misconduct, or the exploitation of a financially vulnerable target," *i.e.*, an up to 4:1 case) (citation omitted); *Eden Elec., Ltd. v. Amana Co.*, 370 F.3d 824, 829 (8th Cir. 2004) (upholding a $10 million punitive award with a greater than 4.5:1 ratio in a case involving purely economic harm that "did not evince a disregard for the health or welfare of others, and the fraud involved only a single incident and a single victim"); *Casillas-Diaz v. Palau*, 463 F.3d 77, 86 (1st Cir. 2006) (10:1 or greater ratio appropriate in case involving "substantial physical and emotional harm"); *Campbell*, 98 P.3d at 418 (9:1 ratio for insurance bad faith case); *Hollock v. Erie Ins. Exchange*, 842 A.2d 409 (Pa. Super. Ct. 2004) (10:1 ratio for insurance bad faith); *McClain v. Metabolife Int'l*, 259 F. Supp. 2d 1225, 1235 (N.D. Ala. 2003) (9:1); *Trinity Evangelical Lutheran Church & School-Freistadt v. Tower Ins. Co.*, 661 N.W.2d 789, 803 (Wis. 2003) (7:1 ratio); *Bocci v. Key Pharms., Inc.*, 76 P.3d 669, 674-76 (Or. Ct. App. 2003) (7:1 ratio); *Haberman v. The Hartford Ins. Group*, 443 F.3d 1257, 1271-72 (10th Cir. 2006) (ratio of 20:1 appropriate in insurance bad faith case with small amount of economic damages).

Perhaps more revealing about "current trends," the Supreme Court recently took review (again) in *Philip Morris USA Inc. v. Williams*, but ultimately dismissed *certiorari* as improvidently granted, thereby leaving **intact** a $79 million punitive award with a 97:1 ratio.  129 S. Ct. 1436 (2009).

More fundamentally, Defendants all but concede (at 66) that *Planned Parenthood* would permit a 4:1 ratio in this case:  "even under *Planned Parenthood*'s "rough framework," the highest permissible ratio here would be 4:1."  Implicit in this concession is that **unless** Judge Mahan's reprehensibility findings are clearly erroneous, this Court should affirm his use of a higher single-digit ratio.

### b)    Judge Mahan Correctly Calculated the Ratios

Under Ninth Circuit precedent, where the jury separately assesses each defendant with punitive damages, the ratio should be calculated by comparing the plaintiff's compensatory award with the "punitive damages awards **as to each defendant**."  *Planned Parenthood*, 422 F.3d at 961 & Appendix III (showing how to calculate the ratio) (emphasis added).  True, as Defendants note (at n.26) when *Planned Parenthood* remitted the award, it used a different method to calculate the ratio, but it gave no reason for so doing, and its rationale (and common sense) supports the separate calculation it championed.  Indeed, two bank robbers do not receive less punishment than a single bank robber stealing the same amount of

money. Yet, as Defendants would have it, if five criminals participated in a bank robbery warranting ten years of punishment, the defendants would "share" the sentence and serve two years each.

In this case, Provident master-minded the overall scheme to target the insureds, developed the weapons that could be used for termination, and gave these weapons to Revere. Revere took these weapons, pointed them at their insureds, including Merrick, and pulled the trigger. Each Defendant should be separately punished, and the ratio must be calculated by using the full amount of the harm. Defendants even concede that in this case, unlike in the cases they cite, the jury *separately assessed* punitive damages against each Defendant, which triggers the separate calculation under *Planned Parenthood.* 422 F.3d at 961.

Defendants' plea for leniency based on their organizational structure ignores that they are separate corporate entities, and should be treated as such under the law. *See O'Neill v. Comm'r of Internal Revenue Serv.*, 271 F.2d 44, 49 (9th Cir. 1959) (corporation should "be treated as an entity separate from the individuals who own it . . . where the corporation is created for a business activity . . . ."). Defendants simply want the benefits of incorporation when it suits them, without having to live with the burdens when it does not. Yet the law does not permit a corporation to change its stripes depending on what suits it best on appeal.

Defendants' contention that Judge Mahan erred by adjusting the numbers to the same present value is nonsense. Because of the "time value" of money, to make a true "apples to apples" comparison of dollars from different periods, the numbers should be adjusted to the same "real term" dollars. *See Monessen SW Ry. Co. v. Morgan*, 486 U.S. 330, 339-40 (1988) (describing this concept as a "self-evident" one applicable under "federal law"). It would be fundamentally unfair to punish Defendants less (in real terms) because of delay. And, whether other parties have raised this issue in other cases is irrelevant.

Consequently, Judge Mahan correctly calculated the ratios for Paul Revere as 8.18:1, and Provident as 12.28:1 (before he reduced it to 9:1).[170] The ratios here fall within the single-digit range, and fit generally within the Ninth Circuit's "rough framework." Judge Mahan did not err by so concluding.

### c)   Defendants' Remaining Ratio Arguments Lack Merit

Defendants contend (at 68-69) that the jury's award of emotional distress damages already includes a punitive element. But causing a victim to suffer emotional distress warrants greater punishment, not less. *Campbell,* 98 P.3d at 418 (causing $1 million of emotional distress and humiliation" significantly worse than causing "$1 million of economic harm"). Additionally, the jury here was appropriately instructed concerning the award of punitive damages, and knew of

---

[170] ER37.

the emotional distress award. The emotional award is also a small portion of the overall award, *Hangarter*, 373 F.3d at 1014 n.11.

### 3. Comparable Civil and Criminal Penalties Support the Award

Under Ninth Circuit precedent, this Court looks "only to whether or not the misconduct was dealt with seriously under state civil or criminal laws," not the amount of the particular penalties. *See Exxon*, 490 F.3d at 1094. Here, as Defendants concede, Nevada has enacted civil penalties for the conduct at issue, and could exact that penalty for each infraction.

Moreover, an insurer that engages in repeated bad faith may suffer substantial penalties, including a loss of license. N.R.S. § 686A.183(1)(b). The market conduct exams also confirm that is a real threat in this case. Although Defendants argued in the last appeal that *State Farm* precluded this comparison, they are wrong. In *State Farm,* unlike this case, the evidence supporting a loss of license was based on "dissimilar conduct" (*i.e.*, the evidence of first party claim's handling in a third-party bad faith case). *State Farm*, 538 U.S. at 414, 428; *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003).

### D. Other Considerations Show That Defendants Have No "Due Process" Right to Any Further Reduction

The lynchpin connecting the Due Process Clause to punitive damages caps in civil actions has been the concept of "grossly excessive." *See TXO*, 509 U.S. at

458 (inquiry is "whether a particular award is so 'grossly excessive' as to violate the Due Process Clause"). *Gore* clarified that such excessiveness is determined by examining a states "legitimate interests" and "fair notice." 517 U.S. at 568, 596; *State Farm*, 538 U.S. at 416-17. Examining these "first principals" of due process likewise shows this Court should affirm.

### 1. The Punitive Awards Are Necessary to Further Nevada's Interests in Punishing Systematic Insurance Bad Faith

*Gore* explained that because a state may further its "legitimate interests in punishing unlawful conduct and deterring its repetition," "[o]nly when an award can fairly be categorized as *'grossly excessive' in relation to these interests* does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." 517 U.S. at 568 (emphasis added). "For that reason, the federal excessiveness inquiry appropriately begins with an identification of the state interests that a punitive award is designed to serve." *Id.*

In this case, Nevada has expressed particular concern with "mak[ing] sure that the insurance companies who do business in this state cannot make an economic decision to treat a Nevada insured oppressively. . . ."[171] Accordingly, when the Nevada Legislature imposed caps and other procedural limitations on punitive damage awards in 1989 (including a 3:1 cap in cases with more than

---

[171] SER Tab C:142.

$100,000 in damages), it expressly *exempted* an "insurer who acts in bad faith regarding its obligations to provide insurance coverage." N.R.S. § 42.005(2)(b).

Nevada's interest in preventing insurers from making an economic decision to treat insureds oppressively supports a high single-digit ratio in this case. Importantly, when the wrongdoer gains financially from the conduct, punitive damages award may help "limit[] the defendant's ability to profit from its fraud . . . ." *Mathias*, 347 F.3d at 677; *see also Pac. Mut. Life v. Haslip*, 499 U.S. 1, 22 (1991) (a court may take into account "the profitability to the defendant of the wrongful conduct and the desirability of removing that profit"); *Gore*, 517 U.S. at 566; *Cooper Indus.,* 532 U.S. at 442.

The profitability of Defendants' "claims-scrubbing" practices is so enormous (literally hundreds of millions of dollars) that only punitive awards of high multiples can come close to serving the legitimate interests of punishment and deterrence. This case – where Defendants' wrongdoing against Merrick dates back to 1996 – proves how difficult it is for an individual to take on Defendants. If Defendants get caught in one in ten cases (they likely get caught less), failure to leave intact high single-digit jury awards will eviscerate all punitive and deterrent effect.[172]

---

[172] EX325:6 (showing in 2001/2002 107 errors in 353 files or 30%, and it seems to have been worse in the late 1990s); 6/20/08:159:8-19.

Nevada's strong interest in punishing and deterring systematic bad faith likewise makes Defendants' wealth an appropriate consideration. Although "[t]he wealth of a defendant cannot justify *an otherwise* unconstitutional punitive damages award," *State Farm*, 538 U.S. at 427 (emphasis added), using the defendant's wealth in setting the level of punitive damages is not "unlawful or inappropriate," *Gore*, 517 U.S. at 591 (Breyer, J., concurring). To the contrary, it is common sense (recognized by Nevada law) that a penalty that can readily be absorbed by a defendant is likely to have little or no punitive effect. *Ainsworth v. Combined Ins. Co.*, 763 P.2d 673, 677 (Nev. 1988) ("The wealth of a defendant is directly relevant to the size of an award, which is meant to deter the defendant from repeating his misconduct as well as punish him for his past behavior."). Consequently, the Due Process Clause may permit a higher ratio depending on "the net worth of the defendant." *Irvin*, 563 F.3d at 793 (Reinhardt, J. concurring).

In this case, Judge Mahan instructed the jury that it should consider "[t]he amount of punitive damages which will have a deterrent effect . . . in light of the defendant's financial condition . . . ."[173] The jury received Defendants' financial information, and their awards amounted to less than 2.4% of Paul Revere's net worth, and less than 0.45% of Provident's (before Judge Mahan's reduction).[174]

---

[173] D506(#14).
[174] *See* ER35 n.36; EX341; EX342.

Judge Mahan's finding that anything less than a 9:1 ratio would not "meet Nevada's legitimate goals of punishment and deterrence" is not clearly erroneous.

### 2.    Defendants Had Ample Notice of Their Punishment

The Supreme Court has also explained that a punitive award is "grossly excessive" when it amounts to a deprivation of property about which the defendant did not receive "fair notice." *State Farm*, 538 U.S. at 416-17; *see also Gore*, 517 U.S. at 574 (due process protects the right to receive "fair notice . . . of the severity of the penalty that a State may impose"). Consequently, if a person had notice "of the severity of the penalty that a State may impose," there is no constitutional basis to reduce the penalty. *Gore*, 517 U.S. at 574.

In this case, the Nevada Legislature – by exempting bad faith awards from the otherwise applicable 3:1 cap – gave Defendants notice that their misconduct directed at Nevada citizens would expose them to ratios greater than 3:1. This Court's framework has also provided notice that punitive awards in the high single-digit range will not be reduced if they arise from highly reprehensible conduct like that found by Judge Mahan in this case.

Alternatively, if Defendants would rather focus on pre-1996 notice, the Nevada Supreme Court made clear in 1988 that a punitive award for bad faith in the range of .4% of a defendant's "total assets" would further its interests. *See*

*Ainsworth*, 763 P.2d at 677.  That would warrant up to $40 million for Provident alone.[175]

In the end, due process prohibits only a "grossly excessive" award, leaving to each state "*considerable flexibility* in determining" whether "the damages awarded [were] reasonably necessary to vindicate the State's legitimate interests in punishment and deterrence."  *Gore*, 517 U.S. at 568 (emphasis added).  Defendants had no right to a better result in the second trial than the first.  The Court should affirm Judge Mahan's assessment that the awards here, as reduced, comport with due process.

## CONCLUSION

For the reasons set forth above, this Court should affirm.

RESPECTFULLY SUBMITTED this 6th day of November, 2009.

OSBORN MALEDON, P.A.

By  s/Thomas L. Hudson
    Thomas L. Hudson
    Sharad H. Desai
    2929 North Central Avenue, Suite 2100
    Phoenix, Arizona  85012-2794

FRIEDMAN RUBIN & WHITE
Richard H. Friedman
1126 Highland Avenue
Bremerton, Washington  98337

---

[175] EX342.

LAW OFFICE OF JULIE MERSCH
Julie A. Mersch
701 South 7th Street
Las Vegas, Nevada  89101

Attorneys for Plaintiff/Appellee

# CERTIFICATION OF COMPLIANCE WITH RULE 32(a)

I certify that:

Oversize Briefs:

1.      The Court granted permission to exceed the length limitations set forth at Fed. R. App. P. 32(a)(7) by Order dated July 15, 2009.

☒      This brief contains 17,974 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☒      this brief has been prepared in a proportionately spaced typeface using MS Word in 14 point Times New Roman.

Dated this 6th day of November, 2009.


  s/Thomas L. Hudson
Thomas L. Hudson
Attorney for Plaintiff/Appellee

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 6, 2009.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 s/Thomas L. Hudson
Thomas L. Hudson
Attorney for Plaintiff/Appellee